```
1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
2
  ------------------------------------------------------------
3                               )
   United States of America,    )  File No. 21-cr-245
4                               )                (NEB/JFD)
        Plaintiff,              )
5                               )
   v.                           )
6                               )  Courtroom 13W
   Muse Mohamud Mohamed,        )  Minneapolis, Minnesota
7                               )  Monday, May 9, 2022
        Defendant.              )  8:53 a.m.
8                               )
  ------------------------------------------------------------
9
             BEFORE THE HONORABLE NANCY E. BRASEL
10              UNITED STATES DISTRICT COURT JUDGE
             (JURY TRIAL PROCEEDINGS - VOLUME I OF II)
11
   APPEARANCES
12   For the Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                             BY:  ANGELA M. MUNOZ
13                                KIMBERLY A. SVENDSEN
                             600 United States Courthouse
14                           300 South Fourth Street
                             Minneapolis, Minnesota 55415
15

16   For the Defendant:      CLIPPERT LAW FIRM
                             BY:  CHARLES F. CLIPPERT
17                           101 East Fifth Street, #1500
                             St. Paul, Minnesota 55101
18

19   Court Reporter:         RENEE A. ROGGE, RMR-CRR
                             United States Courthouse
20                           300 South Fourth Street, Box 1005
                             Minneapolis, Minnesota 55415
21

22

23
        Proceedings recorded by mechanical stenography;
24   transcript produced by computer.

25                              *   *   *
```

# I N D E X

|                                          | PAGE |
|------------------------------------------|------|
| Court's Preliminary Instructions         | 8    |
| Government's Opening Statement           | 19   |
| Defendant's Opening Statement            | 29   |

**JON MARTIN**
| Direct Examination by Ms. Munoz          | 35   |
| Cross-Examination by Mr. Clippert        | 69   |
| Redirect Examination by Ms. Munoz        | 77   |
| Recross-Examination by Mr. Clippert      | 79   |

**NASRO JAMA**
| Direct Examination by Ms. Munoz          | 81   |
| Cross-Examination by Mr. Clippert        | 89   |

**MUSTAFA HASSAN**
| Direct Examination by Ms. Svendsen       | 92   |
| Cross-Examination by Mr. Clippert        | 102  |
| Redirect Examination by Ms. Svendsen     | 104  |

**ABDIRIMAN MUSE**
| Direct Examination by Ms. Svendsen       | 105  |
| Cross-Examination by Mr. Clippert        | 113  |

**OSMAN ABDULLE**
| Direct Examination by Ms. Munoz          | 115  |
| Cross-Examination by Mr. Clippert        | 121  |

GOVERNMENT EXHIBITS: | REC'D
| 1  | 33 |
| 2  | 33 |
| 3  | 33 |
| 4  | 33 |
| 6  | 55 |
| 7  | 55 |
| 8  | 55 |
| 9  | 55 |
| 10 | 55 |
| 11 | 55 |
| 12 | 55 |
| 13 | 55 |
| 14 | 55 |
| 16 | 33 |
| 17 | 33 |
| 18 | 33 |
| 19 | 33 |

# I N D E X

|  | PAGE REC'D |
|---|---|
| GOVERNMENT EXHIBITS (contd): | |
| 21 | 33 |
| 22 | 33 |
| 23 | 32 |
| 24 | 33 |

\*    \*    \*

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **IN OPEN COURT WITHOUT THE JURY PANEL** |
| 3 | THE COURT:  Good morning.  We are on the record |
| 4 | out of the presence of the jury panel.  This case is the |
| 5 | United States of America versus Muse Mohamud Mohamed. |
| 6 | May I please have appearances, first from the |
| 7 | government? |
| 8 | MS. MUNOZ:  Good morning, Your Honor.  Angela |
| 9 | Munoz and Kim Svendsen on behalf of the United States, and |
| 10 | with us at counsel table is Blake Hostetter from the FBI. |
| 11 | THE COURT:  Good morning. |
| 12 | And from the defense? |
| 13 | MR. CLIPPERT:  Good morning, Your Honor.  Charles |
| 14 | Clippert, C-L-I-P-P-E-R-T, with Mr. Mohamed, who is present. |
| 15 | THE COURT:  Good morning. |
| 16 | We have two interpreters here this morning.  And |
| 17 | before the jury panel comes in, I wanted to have them sworn. |
| 18 | Could you both stand to be sworn? |
| 19 | (Oath administered to the interpreters) |
| 20 | THE COURT:  Thank you.  Could you each state your |
| 21 | name and spell it for the record? |
| 22 | THE INTERPRETER:  My first name is Abdulaziz. |
| 23 | A-B-D-U-L-A-Z-I-Z.  My last name is Hussen.  H-U-S-S-E-N. |
| 24 | The language is Somali. |
| 25 | THE COURT:  Thank you. |

1          THE INTERPRETER:  Good morning, Your Honor.  First

2     name is Ayderus.  A-Y-D-E-R-U-S.  Last name is Ali.  A-L-I.

3     And the language Somali.

4          THE COURT:  Thank you.

5          THE INTERPRETER:  You are welcome.

6          THE COURT:  Mr. Mohamed, as we did for the

7     pretrial, sir, if at any time you are not understanding the

8     interpreter, I want you to let us know so that we can adjust

9     that.

10          In addition, for the interpreters, if at any time

11     we are going too quickly, including the members of the jury

12     panel or the witnesses, please interrupt, let us know, and

13     I'll have folks slow down.

14          THE INTERPRETER:  Thank you.

15          THE COURT:  Thank you.

16          Is there anything from the government that needs

17     to be raised before the jury panel comes in?  Ms. Munoz?

18          MS. MUNOZ:  No, Your Honor.

19          THE COURT:  Thank you.

20          From the defense, Mr. Clippert?

21          MR. CLIPPERT:  Your Honor, I just had sent

22     chambers an email that I got a message on my phone about a

23     close contact from people on May the 29th.  One of the, one

24     of the prosecutors I had in that case up in Anoka County

25     tested positive, and so this might be her colleague.  I was

1    also at a Wild game on that Friday night, so it could have

2    been someone in my row.  I have no idea, but --

3            THE COURT:  You were just notified that you were a

4    close contact?

5            MR. CLIPPERT:  Correct.  And I'm just passing it

6    along.

7            THE COURT:  Thank you.  And so just a couple

8    questions about that.  The notification that you received

9    was an automated notification through Minnesota Department

10   of Health?

11           MR. CLIPPERT:  Yes, Your Honor.

12           THE COURT:  Okay.  And you have tested negative

13   yesterday and today?

14           MR. CLIPPERT:  Last time I tested was Thursday,

15   and it was negative.

16           THE COURT:  All right.  And you've had no

17   symptoms?

18           MR. CLIPPERT:  No.

19           THE COURT:  All right.  Any objection to our going

20   forward, Ms. Munoz?

21           MS. MUNOZ:  No, Your Honor.  Thank you.

22           THE COURT:  And, Mr. Mohamed, are you all right

23   going forward, given the information you've just been given?

24           THE DEFENDANT (through interpreter):  Yes.

25           THE COURT:  All right.  Thank you.

1    As is the court.  And so we will go forward.

2    Anything else from the defense, Mr. Clippert?

3    MR. CLIPPERT:  Nothing further, Your Honor.

4    THE COURT:  All right.  Then we are going to --

5 I'll step off the bench.  We will call in the jury, and we

6 will begin the process of voir dire.

7    You should have a seating chart.  And, again, in

8 the jury box Number 1 sits in the back row closest to me,

9 Number 9 in the front row closest to me, Number 17 to the

10 back right in the front row of, in front of the bar, and

11 Number 25 in the seat closest to the aisle, and then it goes

12 from there.  So we'll see how I do reading that map as we go

13 forward.

14    Ms. Wegner, are you ready to get the jury?

15    COURTROOM DEPUTY:  I am.

16    THE COURT:  All right.  Then I'll step off the

17 bench for a moment while they all come in.  Thank you.

18    COURTROOM DEPUTY:  All rise.

19    (Recess taken at 8:58 a.m.)

20  (Whereupon, jury voir dire took place at this time and

21 said proceedings are not contained within this transcript.)

22 1:45 P.M.

23       **IN OPEN COURT**

24       **(JURY PRESENT)**

25    THE COURT:  You may all be seated.

1          Members of the jury, can you all hear and see me?

2     If at any point you can't or you are having difficulty,

3     please raise your hand and let me know.

4          Members of the jury, before you listen to the

5     opening statements, I'm going to take a few moments to give

6     you some initial instructions about the case and about your

7     duties as jurors.  At the end of the trial I'm going to give

8     you further instructions.  I may also give you instructions

9     during the trial.  Unless I specifically tell you otherwise,

10    all instructions, both those I give you now and those I give

11    you later, are equally binding on you and they must be

12    followed.

13         First, we ask that your cell phone, smartphone,

14    any other devices be turned off completely during the trial

15    and that you only use them during breaks.

16         During your deliberations, just as a head's up,

17    you are not allowed to have wireless communication devices

18    in the jury room.  So at the end of the trial the court

19    security officers will collect those devices for safekeeping

20    before you begin deliberating each day, and they will be

21    returned to you at the end of the deliberation day.

22         As I noted during voir dire, this is a criminal

23    case.  It is brought against Muse Mohamud Mohamed by the

24    United States of America.  Mr. Mohamed is charged with two

25    counts of making a False Declaration Before a Grand Jury.

1    Those charges are set forth in what is called an Indictment.

2    And it reads as follows:

3            Count 1, False Declaration Before a Grand Jury.

4    On or about October 14, 2021, in the State and District of

5    Minnesota, while testifying under oath in a proceeding

6    before a grand jury of the United States, the defendant

7    Mr. Mohamed did knowingly make a false material declaration,

8    that is, he testified that "I got three absentee ballots

9    from the elections office.  I took -- I took those ballots

10   to the voters, they filled them out, they voted, and then I

11   took them back and turned those -- I turned those absentee

12   ballots back to the election office."  Instead, as

13   Mr. Mohamed then and there well knew, Mr. Mohamed did not

14   take any ballots to the three voters named on the absentee

15   ballot envelopes, and the three voters did not give their

16   ballots to Mr. Mohamed to return to the election office, in

17   violation of Title 18, United States Code, Section 1623(a).

18   So that was the first allegation as to Count 1.

19           As to Count 2, the second allegation reads as

20   follows:  False Declaration Before a Grand Jury.  On or

21   about October 14, 2021, in the State and District of

22   Minnesota, while testifying under oath in a proceeding

23   before a grand jury of the United States, the defendant

24   Mr. Mohamed did knowingly make a false material declaration,

25   that is, he testified that "I got the absentee ballot from

the elections office and took it to Nasro Jama" and "I remember Nasro Jama was the one who filled out the absentee ballots -- or the absentee ballot, sealed it up and then told me to drop it off for her."  Instead, as Mr. Mohamed then and there well knew, Mr. Mohamed did not receive a sealed absentee ballot envelope from Nasro Jama, and Nasro Jama did not ask Mr. Mohamed to drop off Nasro Jama's absentee ballot, all in violation of Title 18, United States Code, Section 1623(a).

You should understand that the indictment is simply an accusation.  It is not evidence of anything. Mr. Mohamed has pleaded not guilty and is presumed to be innocent unless and until proved guilty beyond a reasonable doubt.

It will be your duty to decide from the evidence whether Mr. Mohamed is guilty or not guilty of the crimes charged.  From the evidence you will decide what the facts are.  You are entitled to consider the evidence in light of your own observations and experiences in the affairs of life.  You may use reason and common sense to draw deductions or conclusions from facts which have been established by the evidence.  You will then apply those facts to the law which I give you in these and other instructions and in that way reach your verdict.

You are the sole judges of the facts.  You must

follow my instructions, however, whether you agree with them or not.  You have taken an oath to do so.  Do not allow sympathy or prejudice to influence you.  The law demands of you a just verdict unaffected by anything except the evidence, your common sense and the law as I give it to you.

As I indicated before, you should not take anything that I do or say as indicating what I think of the evidence or what I think your verdict should be.

And please remember that only Mr. Mohamed and not anyone else is on trial here and that he is on trial only for the crimes charged and not for anything else.

In order to help you follow the evidence, I want to give you a brief summary of the elements of the crimes charged, which the government must prove beyond a reasonable doubt to make its case.

The crime of making a False Declaration Before a Grand Jury as charged in Counts 1 and 2 of the indictment has four elements, which are:

One, the defendant testified under oath or affirmation before a grand jury that, in Count 1, "I got three absentee ballots from the elections office.  I took -- I took those ballots to the voters, they filled them out, they voted, and then I took them back and turned those -- I turned those absentee ballots back to the election office."

And in Count 2, "I got the absentee ballot from

the elections office and took it to Nasro Jama" and "I
remember Nasro Jama was the one who filled out the absentee
ballots -- or the absentee ballot, sealed it up, and then
told me to drop it off for her."

The second element is that that testimony was
false in whole or in part.

The third element is that at the time Mr. Mohamed
so testified he knew his testimony was false.

And the fourth element is that the false testimony
was material.

False testimony is material if the testimony was
capable of influencing the grand jury.  It is not necessary
to find that the testimony actually affected the grand jury.

You should understand, again, that this is only a
preliminary outline.  At the end of the trial I'm going to
give you a final instruction on these matters.  And if
there's any difference between what I told you now and what
I tell you at the end of the trial, what I tell you at the
end of the trial must govern you.

I have mentioned the word "evidence."  "Evidence"
includes the testimony of witnesses, documents and other
things received as exhibits, any facts that have been
stipulated to or agreed to by the parties and any facts that
have been judicially noticed, which are simply facts that I
say you may, but are not required to, accept as true.

1        Certain things are not evidence.  I'm going to

2   list them for you now.

3        Statements, arguments, questions and comments by

4   lawyers representing the parties in the case are not

5   evidence.

6        Objections are not evidence.  Lawyers have a right

7   to object when they believe something is improper.  You

8   shouldn't be influenced by that objection.  If I sustain an

9   objection to a question, you must not -- you must simply

10  ignore the question and not try to guess as to what the

11  answer might have been.

12       Testimony that I strike from the record or tell

13  you to disregard is not evidence and it must not be

14  considered.

15       Anything you hear or see about this case outside

16  the courtroom is not evidence, unless I specifically would

17  tell you otherwise during trial.

18       A particular item of evidence is sometimes

19  received for a particular and limited purpose only; that is,

20  it can be used for you only by one purpose and not for any

21  others.  I will tell you when that occurs and instruct you

22  on the purposes for which it has been received.

23       Some of you may have heard the terms "direct

24  evidence" and "circumstantial evidence."  You're instructed

25  that you should not be concerned with those terms.  The law

1  makes no distinction between direct and circumstantial

2  evidence.  You should give all evidence the weight and value

3  you believe it is entitled to receive.

4          In deciding what the facts are, you may have to

5  decide what testimony of witnesses you believe and what

6  testimony you do not believe.  You may believe all of what a

7  witness says, part of it, or none of it.

8          In deciding what testimony of any witness to

9  believe, consider the witness's intelligence, the

10  opportunity the witness had to have seen or heard the things

11  testified about, the witness's memory, any motives that

12  witness might have for testifying a certain way, the manner

13  of the witness while testifying, whether that witness said

14  something different at an earlier time, the general

15  reasonableness of the testimony and the extent to which the

16  testimony is consistent with other evidence that you

17  believe.

18          You must avoid bias, conscious or unconscious,

19  based on a witness's race, color, ethnicity, national

20  origin, religion, gender, gender identity, sexual

21  orientation, disability or economic circumstances in your

22  determination of credibility.

23          The Somali language may be used during this trial

24  with some witnesses.  If, as we have seen, an interpreter is

25  used, you are to consider only that evidence provided

1    through official court interpreters.  Although some of you

2    may know the language used, it's important that all jurors

3    consider the same evidence.  So you must base your decision

4    on the evidence presented in the English language and

5    disregard any different meaning of non-English words.

6         At the end of the trial you must make your

7    decision based on what you recall of the evidence.  You

8    won't have a written transcript to consult.  It's not

9    practical for the court reporter to read back lengthy

10   testimony.  You must pay close attention to the testimony as

11   it is given.

12        If you wish, you may take notes to help you

13   remember what a witness said.  If you do that, please keep

14   them to yourself until you and other jurors go to the jury

15   room to decide the case.  Don't let note taking distract you

16   from paying attention so that you don't hear answers.  And

17   when you leave at night, your notes will be secured and they

18   won't be read by anyone.

19        As you've noted during voir dire, during the trial

20   it may be necessary for me to talk with the attorneys via

21   sidebar out of the hearing of the jury.  I'll either do that

22   by having a bench conference through headsets or by calling

23   a brief recess.  Understand that while you are waiting, we

24   are working.  I take very seriously your time and try not to

25   waste it, but the purpose of those conferences is to decide

under the law how certain evidence is to be treated and to avoid confusion and error.  So we'll do everything that we can to keep those to a minimum, but they are necessary sometimes.

I've given you some rules already about your own conduct.  I'm going to give those again for you now.

First, do not talk or communicate amongst yourselves about the case or anyone involved with it until the end of the case when you go to the jury room.

Second, do not talk with anyone else about this case or anyone involved with it until the trial has been ended.  So you can't talk amongst yourselves or about anyone involved, and you can't talk to anyone involved.

Third, while you are outside the courtroom, do not let anyone tell you anything about this case or anyone involved with it until the trial has ended and your verdict has been accepted by me.  If someone should try to tell you something or talk to you, please report it to court staff.

Fourth, during the trial, again, do not speak with any of the parties, lawyers or witnesses involved in the case, even to pass the time of day.  And I've already explained that to you.

Fifth, I understand that it may be necessary for you to tell your family and close friends, teachers, employers, coworkers where you are.  You can explain that

1    you're required to be in court.  And you can warn them not

2    to ask you about the case, tell them anything they think

3    they know about the case or discuss it in your presence.

4         You must not communicate with anyone or post any

5    information about parties, witnesses, participants, charges,

6    evidence or anything else related to the case or to tell

7    anyone anything about the jury's deliberations in this case

8    until after I accept your verdict or until I give you

9    specific permission to do so.

10        And the reason that I've gone on at length about

11   this issue is that if you discuss the case with someone

12   other than jurors during deliberations, it can create a

13   perception that you've decided it based on something outside

14   the courtroom or that something outside the courtroom has

15   influenced your verdict.  And that would not be fair to the

16   parties in this case.

17        Sixth, again, do not do any research about the

18   case in any way.  And that includes the case, the law, the

19   people involved, including the parties, the witnesses, the

20   lawyers or the judge.

21        Seventh, do not read anything about this case,

22   news story, an article in print, something online, something

23   on social media or in any blog or app about the case or

24   anyone involved with it.

25        The parties have a right, again, to have this case

1     decided solely on the evidence they know about and that it's

2     been introduced here in court.  And the court's concern is

3     that if you do any research or investigation or experiment

4     that we don't know about, your verdict could be influenced

5     by inaccurate, incomplete or misleading information.

6          Eighth -- I think we're on eight -- do not make up

7     your mind about this trial or what the verdict should be.

8     Keep an open mind until after all of the evidence has been

9     presented and you go to the jury room to decide the case and

10    you and your fellow jurors have discussed the evidence.

11         And, ninth, I'll just note that faithful

12    performance by you of your duties as jurors is vital to the

13    administration of justice.  You should perform your duties

14    without prejudice or fear and solely from a fair and

15    impartial consideration of the whole case.

16         The trial is going to proceed in the following

17    manner:  First, the court will -- the government will make

18    an opening statement.  Then Mr. Clippert, Mr. Mohamed's

19    attorney, may, does not have to, make an opening statement.

20    Again, an opening statement is not evidence, but simply a

21    summary of what the attorney expects the evidence to be.

22         The government will present its evidence, and

23    counsel for Mr. Mohamed may cross-examine.  Following the

24    government's case, Mr. Mohamed may, but does not have to,

25    present evidence, testify or call other witnesses.  If

1    Mr. Mohamed calls witnesses, the government may

2    cross-examine them.

3            After that presentation of evidence is completed,

4    the attorneys will make closing arguments to summarize and

5    interpret the evidence as they see it.  As with opening

6    statements, closing arguments are not evidence.  And then

7    the court will instruct you further on the law, and you will

8    retire to deliberate on your verdict.

9            At this time I will invite the parties to give

10   their opening statements to you.

11           Ms. Munoz, are you prepared to proceed?

12           MS. MUNOZ:  Yes, Your Honor.  Thank you.

13           THE COURT:  You may do so.

14           MS. MUNOZ:  May it please the court.  Counsel.

15   Members of the jury.

16           This case is about lying under oath.  On

17   October 14th, 2021, the defendant Muse Mohamud Mohamed

18   raised his right hand, he took an oath, and he promised to

19   tell the truth to a grand jury conducting an investigation

20   in the District of Minnesota.  Instead of telling the truth,

21   he lied.  The defendant's lies are why we are here today.

22           When someone lies to a grand jury about

23   information material to the grand jury's investigation, that

24   is a crime.  The crime is called False Declaration Before a

25   Grand Jury.  It's a long phrase for a simple concept; Lying.

1    The defendant is charged with two counts of making a false

2    declaration before a grand jury because of two lies that he

3    told a grand jury on October 14th, 2021.

4          Members of the jury, my name is Angela Munoz.

5    Together with Kim Svendsen and Blake Hostetter from the FBI,

6    we have the privilege of presenting this case to you.

7          Before I talk to you about the substance of what

8    you will hear at trial and about the defendant's lies, I

9    need to give you a little bit of background information.

10   I'm going to cover with you what is the grand jury and what

11   is the agent delivery process for absentee voting.

12         Let's start with the grand jury.  The defendant is

13   charged with lying to a grand jury.  A grand jury is a group

14   of citizens from across the State of Minnesota who have been

15   called for jury duty.  You might be asking yourself, How is

16   it any different than what I'm doing right now.  Well, it's

17   quite a bit different.  A grand jury conducts

18   investigations, and they can be ultimately asked to

19   determine whether somebody committed a crime and whether

20   there's sufficient evidence to charge someone with a crime.

21         The grand jury has the power to bring witnesses in

22   before it, and they can use a document called a subpoena to

23   call somebody in to provide testimony.  Once a witness is in

24   front of the grand jury, the witness takes an oath.  Now,

25   the oath happens before they are asked any questions, and

1  the oath is really important.  It's a promise to tell the

2  truth.  It's a promise to provide truthful information.

3  It's a promise to not leave out important information.

4          After taking the oath, the witness is then asked

5  questions by both the prosecutor and members of the grand

6  jury.

7          Because of the importance of the grand jury's

8  investigative work, a court reporter is present for all of

9  the proceedings before the grand jury.  The court reporter

10  creates a written transcript documenting all of the

11  questions asked of the witness and all of the witness's

12  answers.

13          During the course of this trial you will see two

14  transcripts that were created when the defendant testified

15  before the grand jury, once on September 30th of 2021 and

16  again on October 14th of 2021.

17          As I mentioned, one of the jobs of the grand jury

18  is to conduct investigations; and when a grand jury is doing

19  this solemn and important work, it's trying to figure out

20  what happened.  They can't do that if witnesses come before

21  them and fail to tell the truth.

22          So that's the background information about the

23  grand jury.  We'll shift now to the agent delivery process

24  for absentee voting.

25          The agent delivery process is a way to vote in an

1    election with an absentee ballot in the State of Minnesota.

2    It's not commonly used, and, in fact, it's only available

3    and only an option seven days before an election, and the

4    process is available in limited situations when a voter

5    cannot get to her assigned polling place.  So, for example,

6    she cannot get to the school in her community where she

7    normally votes in person, because she's hospitalized or she

8    has a disability, and she needs someone to help her and

9    bring her her ballot and return the ballot for her.

10            So there are two important people that you will

11   learn about through the course of this trial in the agent

12   delivery process.  There's the voter, and there's the agent.

13   The voter is the person who needs help getting her ballot.

14   The agent is the person who is agreeing to help get the

15   ballot and return the ballot for her.

16            The rules allow an agent to help up to three

17   voters do this process.  You will learn over the course of

18   this trial that the key to the agent delivery process is the

19   voter.  The voter is the one unable to get to her polling

20   place; The voter is the one to ask for help; The voter is

21   the one to vote her absentee ballot.

22            The agent delivery is a formal process, and it has

23   certain steps, and we will walk through those now.

24            The first step starts with the voter.  You will

25   learn that the voter needs to give the agent two pieces of

1    paper, first a Request For an Agent Delivery, and that's a

2    form that they fill out, and second is an Absentee Ballot

3    Application.

4           So let's start with the Request for Agent Delivery

5    of Absentee Ballot.  This is a form that the voter fills out

6    and uses when the voter decides to vote using the agent

7    delivery process.  The first step is to ask someone to be

8    their agent.  And so once the voter has this form, it's a

9    way for the voter to say, "I can't get to my polling place

10   because I fit into one of these special circumstances,

11   special situations, and I need somebody to pick up my ballot

12   for me."  So there's instructions at the top that you will

13   hear about over the course of this trial, and the

14   instructions note that voters in special situations may ask

15   someone, who is an agent for them, to pick up and return an

16   absentee ballot.  The process, the instruction notes, is

17   available seven days before the election.

18          And then there's certain additional instructions

19   you will learn about for the agent him or herself.  The

20   agent has to be someone that the voter has a preexisting

21   relationship with.  The agent may not be a candidate in the

22   election.  And the voter needs to submit this request with

23   the Absentee Ballot Application.  And we'll cover that next.

24          So during the course of this trial you will learn

25   about how one goes about filling out this request.  And so

1    we'll start with that now.  And so the first step is that in

2    the red box I've highlighted here, that's where the voter's

3    name goes.

4            And there's a certification process here.  So the

5    voter puts their name in there, and then they have to

6    identify which of those three, which are next to the circles

7    on the form, special situations apply to them.  It may be

8    that the voter is a patient in a health care facility.

9    That's the first one.  The second one may be that the voter

10   is a resident in a residential facility or a battered

11   women's shelter or an assisted living facility.  And then

12   the third one, which I expect you will hear about most in

13   this trial, is the third situation, which is an

14   incapacitating health reason or disability.

15           The next blank on the form is where the agent's

16   name goes.  This is the blue box here.  And the voter is

17   certifying that they fall into one of these special

18   situations and they need this person, who is going to be

19   their agent, to deliver these papers to election officials

20   and then have that -- because they have -- and they have a

21   preexisting relationship with that person.  Finally, the

22   voter then signs, and that's the last red box on your

23   screen.

24           So I mentioned that there were two papers that the

25   voter needs to fill out.  The second one is the Absentee

1    Ballot Application.  And this is the paper that the voter

2    fills out and provides all of their background information

3    to convey to the election officials that "I need a ballot,"

4    the voter certifies that they are eligible to vote, and then

5    the background information is used to find out where the

6    person lives and make sure that they get the right ballot,

7    because we don't all get the same ballot.  The voter also

8    signs this form, and that's highlighted in red at the bottom

9    of the page.

10          So going back to the steps in the agent delivery

11   process, you will learn that the next part of the process

12   then is where the agent comes in.  So once the agent

13   receives those two forms, they deliver the forms to the

14   election office.  You will learn that the agent then picks

15   up the absentee ballot and delivers the absentee ballot back

16   to the voter.  And you will learn over the course of this

17   trial that the agent's role is to be a delivery person.

18   They are picking up forms, turning them in, picking up the

19   ballot, bringing it back to the voter, taking the ballot to

20   the voter.

21          The next step is for the voter to fill out the

22   ballot.  And once the voter has filled out the ballot, the

23   agent comes into play again, and their responsibility is to

24   deliver that ballot back to the election office.  The ballot

25   is then logged by election officials on the agent return

1     log, and the process is then complete.

2              So with that background information, we'll turn

3     back to why we are here today and what this case is about.

4              Those are the lies that this defendant Mr. Mohamed

5     told to the grand jury.  A grand jury in the District of

6     Minnesota was conducting an investigation into the use of

7     the agent delivery process.  They were investigating certain

8     instances of the use of this process during the August 11th,

9     2020, primary in the City of Minneapolis.  The grand jury

10    was trying to figure out whether absentee ballots were

11    turned into the election office by agents who did not have

12    the voters' permission.

13             The defendant was served with a subpoena.  That's

14    the document that I referenced.  It's used to call somebody

15    into court and into the grand jury.  The defendant was

16    called to testify two times, on September 30th and again on

17    October 14th.  And he was called into the grand jury to

18    testify because the defendant's name was on election records

19    as an agent who turned in absentee ballots for the

20    August 11th primary.

21             When it was the defendant's turn to testify in

22    front of the grand jury, he stood in a witness box, pretty

23    similar to the one right over here, he raised his hand, he

24    took an oath, and he promised to tell the truth to the grand

25    jury.

Now, before a single question was asked of him, he was specifically reminded by a prosecutor that it is a crime to lie about something material to the grand jury's investigation. And on both September 30th and again on October 14th the defendant was asked dozens of times about turning in ballots for the August 11th election. He was asked about what he did and what he knew, and the defendant chose to lie over and over again.

He testified that he followed the rules of the agent delivery process, but you will learn over the course of this trial that that did not happen. He told the grand jury that the voters asked him to deliver their ballots. The evidence will show that this is not true. The evidence will show beyond a reasonable doubt that the defendant knowingly lied to the grand jury about those ballots. The trial is about two of those lies.

Count 1 is listed here as follows: On October 14th the prosecutor and the grand jury asked the defendant, "Did you pick up any ballots and actually bring them to the voters?"

And the defendant answered, "Okay. So I got three absentee ballots from the elections office. I took -- I took those ballots to the voters, they filled them out, they voted, and then I took them back and turned those -- I turned those absentee ballots back to the election office."

1          The evidence at trial will show beyond a

2    reasonable doubt that this was a lie.

3          Count 2.  During that same morning and later in

4    his testimony the prosecutor asked the defendant a series of

5    questions about a voter named Nasro Jama.  The prosecutor

6    asked first, "I am talking about if you picked up an

7    absentee ballot and brought it to Nasro Jama.  Did you do

8    that?"

9          The defendant answered, "I got the absentee ballot

10   from the elections office and took it to Nasro Jama."

11         The prosecutor again asked, "So you're saying that

12   you picked up a blank absentee ballot from the election

13   office and you brought that directly to Nasro Jama?"

14         And the defendant answered, "You know, from what I

15   remember, if my memory is correct, I remember Nasro Jama was

16   the one who filled out the absentee ballots -- or the

17   absentee ballot, sealed it up, and then told me to drop it

18   off for her."

19         The evidence will show beyond a reasonable doubt

20   that the defendant's answers were lies.

21         So why does it matter that the defendant lied to

22   the grand jury?  In the United States we have a

23   one-person/one-vote system.  And over the course of the

24   trial, you will learn and see that the evidence will show

25   that the grand jury was investigating the agent delivery

process.  They were investigating its use during the
August 11th primary in the City of Minneapolis.  The grand
jury was trying to figure out what happened.

You will learn that the members of the grand jury
themselves asked the defendant questions.  They were trying
to figure out what happened.  Where did the ballots that the
defendant turned in come from?  Where did he get those
ballots?  Who filled out those ballots, if it wasn't the
voters themselves?

The evidence will show you beyond a reasonable
doubt that the lies that the defendant told to the grand
jury were about information at the very heart of the grand
jury's investigation.  You will see that the defendant lied
and lied and lied while under oath before the grand jury
about information that was material to the grand jury's
investigation.

And at the end of the trial we will have the
chance to come before you again and we will ask you to
return the only verdict that is consistent with this
evidence; That's a verdict of guilty.

Thank you.

THE COURT:  Mr. Clippert, opening statement?  You
may proceed.

MR. CLIPPERT:  May it please the court.  Counsel.
You've heard the parties in this case.  It's the

1   United States of America versus Muse Mohamed.  Just think

2   about that.  It's the United States of America versus Muse

3   Mohamed.

4          And the government did a real nice job of laying

5   out this agency voting process, so I'm not going to spend a

6   lot of time talking about that, but that's going to be an

7   important issue before this case.

8          And I'm going to ask you to pay close attention to

9   the witnesses, pay close attention to the testimony that's

10  offered from that stand, carefully consider the exhibits,

11  because there's going to be quite a few exhibits offered.

12  You are going to have to look at those exhibits in context

13  and in light of all the other evidence that's presented and

14  the testimony that's been presented.  And I'm being very

15  brief because the government did a very good job.

16         And once we're done with the presentation of

17  evidence, I have a chance to come back and I'm going to be

18  making arguments as to why the government has not proven the

19  case beyond a reasonable doubt, and I'll be asking for a not

20  guilty verdict.

21         Thank you.

22         THE COURT:  The government may call its first

23  witness.

24         MS. MUNOZ:  Thank you, Your Honor.  We have a

25  number of stipulated exhibits, if we can put those on the

1    record first.

2         THE COURT:  You may do so.

3         MS. MUNOZ:  And I'll get set up while Ms. Wegner

4    is moving.

5         THE COURT:  Thank you.

6         MS. MUNOZ:  Your Honor, if I may get a little

7    assistance from our technical support person?

8         THE COURT:  Sure.

9         MS. MUNOZ:  Thank you, Your Honor.

10                    (Off the record)

11        MS. MUNOZ:  Your Honor, I believe it may be an

12   issue with the court's IT system.

13        THE COURT:  Just a moment.

14        MS. MUNOZ:  Thank you.

15        THE COURT:  Sorry, everyone.  This is harder than

16   it looks.

17        MS. MUNOZ:  We're in business, Your Honor.  Thank

18   you.

19        THE COURT:  All right.  Great.  Thank you.

20        MS. MUNOZ:  The parties have stipulated to several

21   exhibits.  If we can put those into the record now?

22        THE COURT:  Go ahead.

23        MS. MUNOZ:  And so with respect to Government

24   Exhibit Number 23, that is the stipulation itself, and the

25   stipulation is with respect to Exhibits 1 through 4.  And so

1 if I may, I can read the stipulation into the record.

2     THE COURT:  You may do so.

3     MS. MUNOZ:  So I'm pulling it up on the screen now

4 and it reads:  The United States of America, by and through

5 its attorneys, Andrew M. Luger, United States Attorney for

6 the District of Minnesota, and Assistant United States

7 Attorneys Angela Munoz, Kimberly Svendsen and Allison Ethen,

8 and defendant Muse Mohamud Mohamed, by and through his

9 attorney Charles Clippert, hereby agree as follows:

10    The defendant Muse Mohamud Mohamed testified

11 before a federal grand jury in the State and District of

12 Minnesota on September 30th, 2021, and again on

13 October 14th, 2021.  The parties agree that the transcripts

14 of the defendant's testimony before the grand jury were

15 created and that the transcripts are complete and accurate

16 representations of what was said aloud during the

17 proceedings.  And that is signed by the parties and

18 Mr. Mohamed on page 2.

19     THE COURT:  And so you are offering 23?

20     MS. MUNOZ:  Yes, Your Honor.

21     THE COURT:  Any objection?

22     MR. CLIPPERT:  No objection.

23     THE COURT:  23 is admitted.

24     MS. MUNOZ:  And this stipulation represents and

25 relates to Government Exhibits 1, 2, 3 and 4.  And so the

1    government moves for the admission of those exhibits at this

2    time.

3                THE COURT:  Any objection?

4                MR. CLIPPERT:  Other than what we've discussed

5    earlier, Your Honor.

6                THE COURT:  Thank you.

7                Exhibits 1 through 4 are admitted.  And admitted

8    exhibits may be published to the jury at appropriate times.

9                MS. MUNOZ:  Thank you, Your Honor.

10               I have one more set of exhibits to cover, and

11   these are exhibits that the parties have agreed to and

12   stipulated to their foundation separate from a stipulation,

13   and those exhibits are 16, 17, 18, 19, 21, 22 and 24.  And

14   so the government moves the admission of those exhibits at

15   this time.

16               THE COURT:  Any objection?

17               MR. CLIPPERT:  No objection, Your Honor.

18               THE COURT:  16, 17, 18, 19, 21, 22 and 24 are

19   admitted.  And, again, they may be published to the jury at

20   the appropriate time.

21               MS. MUNOZ:  Thank you, Your Honor.  The government

22   is prepared to call its first witness.

23               THE COURT:  Go ahead.

24               MS. MUNOZ:  And it's Jon Martin.

25               THE COURT:  Jon Martin.  Thank you.

1                    MS. MUNOZ:  Thank you.

2                    THE COURT:  Good afternoon.  I'm going to have you

3      just come all the way forward and stay standing to take the

4      oath before you're seated in the witness chair.  Can you

5      raise your right hand for me?

6                               JON MARTIN,

7      called on behalf of the government, was duly sworn, was

8      examined and testified as follows:

9                    THE WITNESS:  I do.

10                    THE COURT:  Thank you.  You can come on up to the

11      witness chair.  And I'll have you turn that microphone on.

12      Is it on?

13                    THE WITNESS:  Yes.

14                    THE DEFENDANT:  All right.  Could you state and

15      spell both your first and last name for the record, please?

16                    THE WITNESS:  Sure.  My name is Jon Martin.  It's

17      spelled J-O-N and, Martin, M-A-R-T-I-N.

18                    THE COURT:  Ms. Munoz, you may inquire.

19                    MS. MUNOZ:  Thank you, Your Honor.  If I may

20      approach the witness with the binder of exhibits.  It's

21      Exhibits 6 through 14.  I've shown defense counsel already.

22                    THE COURT:  You may do so.

23                    MS. MUNOZ:  Thank you.

24

25

1                    DIRECT EXAMINATION

2    BY MS. MUNOZ:

3    Q.  Good afternoon, Mr. Martin.

4    A.  Good afternoon.

5    Q.  Can you please tell the members of the jury where you

6    are currently employed?

7    A.  I'm employed by the City of Minneapolis.  I work for

8    Minneapolis Elections & Voter Services, which is the city's

9    elections division.

10   Q.  And what is your current position?

11   A.  My current position is a supervisor of elections

12   administration.

13   Q.  How long have you held that position?

14   A.  Since June of 2019.

15   Q.  That's coming up on three years?

16   A.  Yes.

17   Q.  All right.  Could you please tell the members of the

18   jury what your duties and responsibilities are in your

19   position?

20   A.  In my position I have two main duties; that is, I

21   oversee the city's absentee vote-by-mail program, which is

22   if voters want to vote by mail, they go through my program.

23   And also I oversee our absentee ballot board, which is the

24   group that accepts and rejects and then also counts all of

25   our absentee ballots.

1            And then beyond that, I have responsibilities

2    overseeing the city's mental health care facility voting

3    program, which is where we go to nursing homes in the city

4    to administer absentee voting, and then also oversee agent

5    delivery for the City of Minneapolis.

6    Q.  Have you held any previous positions with the elections

7    services division?

8    A.  Yes.  From May of 2016 through -- to June of 2019 I was

9    a temporary employee for the City of Minneapolis' elections

10   division.

11   Q.  Do you have an office?

12   A.  Yes.

13   Q.  Where is your office located?

14   A.  The address is 980 East Hennepin Avenue in Minneapolis.

15   Q.  What part of the city is your office in?

16   A.  It is really on the border between northeast and

17   southeast Minneapolis.

18   Q.  I'm going to show you what's already been admitted as

19   Government Exhibit Number 22.  It will pop up on the screen

20   in front of you.  Can you tell us what we're seeing in this

21   exhibit?

22   A.  That is the Minneapolis Elections & Voter Services

23   office, along with our main early vote center.

24   Q.  And so this is where you work?

25   A.  Yes.  Correct.

1    Q.  What types of election activities happen at this office?

2    A.  So at this office we have all of our functions, so our

3    administrative functions, our early vote center, and so

4    there -- our elections warehouse is there.  This is where

5    all of our election judges come in to be trained.  This is

6    also where we do most of our absentee mail functions and

7    also where voters can come for agent delivery.

8    Q.  Are any papers stored at this office?

9    A.  Yes.  All of our election records are stored in this

10   office in our ballot vault.

11   Q.  Can you tell the members of the grand jury what a

12   "ballot vault" is?

13   A.  So a "ballot vault" is a secured vault where we store

14   both our blank ballots, our voted ballots, our absentee

15   ballot applications, our signature envelopes and other

16   various materials both used on voting through the absentee

17   voting process and also on election day, and then we retain

18   those records for 22 months.

19   Q.  Can people actually go to 980 East Hennepin to cast

20   their ballots?

21   A.  Yes.  So starting 46 days prior to election day, which

22   is the start of the absentee voting period, through the

23   Monday before election day, voters can go to our early vote

24   center, which is the right-hand-side door, at our office and

25   they can cast a vote early in person.

1    Q.  Do any voters in the City of Minneapolis have the

2    980 East Hennepin building as their assigned voting place?

3    A.  No.

4    Q.  Were you employed as a supervisory election

5    administrator for the City of Minneapolis in August of 2020?

6    A.  I was, yes.

7    Q.  What happened on August 11th, 2020?

8    A.  On August 11th of 2020, that was the election date for

9    the 2020 primary election.

10   Q.  And were there any other elections that happened on

11   August 11th?

12   A.  So running concurrently with the primary was also the

13   Ward 6, special election for the Ward 6 city council seat.

14   Q.  And was the Ward 6 city council seat part of the

15   Minneapolis City Council?

16   A.  Yes.

17   Q.  Can you tell the members of the grand jury what a

18   "primary election" is?

19   A.  So a "primary election" essentially functions to narrow

20   down the list of candidates who will then appear on the

21   general election ballot.

22   Q.  And so this election, is that separate then from what

23   happens in November?

24   A.  Correct.  Yes.

25   Q.  Who was on the ballot in the primary election for the

1    City of Minneapolis on August 11th?

2    A.  So the ballot was a two-sided ballot.  On the front side

3    were partisan races.  So there was a primary for the U.S.

4    Senate.  There was also a primary for the U.S. House of

5    Representatives District 5.  And then depending on where

6    someone lived, they may have also had a primary for the

7    state house and the state senate.

8            And then on the backside of the ballot are the

9    non-partisan races.  And all Minneapolis voters would have

10   had a primary for the at-large in Special School District 1.

11   And then also depending on where they lived, they may have

12   had a primary for the Fourth District School Board.  And

13   then if they lived in Ward 6, they would have also had the

14   Ward 6 special election.

15   Q.  So I think it's safe to say from your testimony, but

16   I'll ask the question anyway, does the ballot itself differ

17   depending on where somebody lives in Minneapolis?

18   A.  Yes.

19   Q.  All right.  I'm going to show you Government Exhibit

20   Number 16, and this will pop up on your screen.  This one

21   has already been admitted into evidence.  What do we see

22   here on the screen?

23   A.  This is a sample ballot of an official ballot for the

24   2020 August primary.

25   Q.  And what is the difference between a sample ballot and

1    the official ballot?

2    A.  The sample ballot is something that we give to voters

3    who just want to see the ballot.  On the ballot diagonally

4    written it says "sample."  If someone tried to turn this in

5    as their official ballot, we would not accept it.  It's also

6    printed on like regular paper, where an actual ballot is

7    printed on thicker paper.

8    Q.  All right.  So let's start with the top of the document.

9    What is the date for this ballot?

10   A.  The date is August 11th, 2020.

11   Q.  And so is this for the primary election that we've just

12   been talking about?

13   A.  It is, yes.

14   Q.  All right.  Can you describe for us, now that we have

15   the ballot in front of us, what do we see on page 1 of

16   Government Exhibit Number 16?

17   A.  On page 1 is the partisan side.  So there are four

18   columns, one for each of the four major parties in

19   Minnesota.  Voters have to choose one party to vote in for

20   all of the races in that column.  They can't like vote in

21   different columns; if they do, it would invalidate their

22   vote on this side of the ballot.

23   Q.  Let's go to the bottom of the page where I'm

24   highlighting now Minneapolis W-6 P-08 1640.  Can you explain

25   for the members of the jury what this means?

1    A.  So the W in that is ward, and the P in that is precinct.

2    That means that this is a Ward 6 Precinct 8 ballot.

3    Q.  All right.  Let's turn to the backside, which is

4    Government Exhibit 16, page 2.  What do we see here?  And I

5    will highlight the middle section here, and I'll ask you to

6    tell us about the Special Election For Council Member

7    Ward Six section.

8    A.  So this is the non-partisan side of the ballot for this

9    particular ballot.  Because it was a Ward 6 Precinct 8

10   ballot, they had the Ward 6 special election on their

11   ballot; and that election used the ranked-choice voting

12   method, which is why you see three columns with identical

13   names in each of the columns.

14   Q.  So is this the ballot that was used for in-person

15   voting?

16   A.  Yes.

17   Q.  And is it also the same ballot used for absentee voting?

18   A.  Yes.

19   Q.  Can you explain to the jury the ways in which voters

20   could cast their ballot in the August 11th, 2020, primary?

21   A.  So folks could either go on election day to their normal

22   polling place to vote.  Then they could also use one of the

23   various methods of absentee voting.  That includes voting

24   early in person at our early vote center.  Also, they could

25   vote at the Hennepin County Government Center.  They could

1    apply for a ballot through the mail and vote that way.  And

2    then there are some other ways, if they meet certain special

3    criteria.  If they are stationed overseas or in the

4    military, they can vote using the UOCAVA method.  Also, if

5    they live in a nursing home, they could vote using the

6    health care facility voting method.  There's a safe-at-home

7    method, which is administrated by the State of Minnesota.

8    And then also starting the last seven days of the election

9    folks could vote using the agent delivery method as well.

10   Q.  Let's talk about that last method.  We'll shift gears to

11   there.  Can you give the jury an overview of the agent

12   delivery method for absentee voting?

13   A.  So starting seven days prior to election day, a voter

14   can ask an agent that they know to pick up a ballot for them

15   and then bring that ballot to the voter, and then the agent

16   would bring the ballot back to our office.  They can do that

17   starting seven days before election day.  And then the

18   pick-up deadline is 2:00 p.m. on election day itself.  And

19   the voter and the agent have to meet certain criteria to be

20   able to do this process.

21   Q.  All right.  I'm going to show you now what's been

22   admitted as Government Exhibit 21, and here is page 1.

23   Prior to coming in to testify today, did you have the chance

24   to look at Government Exhibit 21?

25   A.  Yes, I did.

1    Q.  Does this exhibit accurately describe the steps in the

2    agent delivery process for absentee voting in the State of

3    Minnesota?

4    A.  Yes, it does.

5    Q.  All right.  Let's walk through this exhibit then.

6    Before we get into the mechanics of agent delivery process,

7    let's start with the people.  So can you tell us who are the

8    two main roles in the agent delivery process?

9    A.  So the two main roles, one is the agent and then the

10   other is the voter.

11   Q.  What qualifications make someone eligible to be an

12   agent?

13   A.  So an agent has to be at least 18 years old, they cannot

14   be a candidate for election, and they have to have a

15   preexisting relationship with the voter.

16   Q.  What makes a voter eligible for the agent delivery

17   process?

18   A.  So a voter has to either live in a nursing home, an

19   assisted living home, a battered women's shelter, a group

20   home, or the voter could be in the hospital, or the voter

21   could have some like health reason where they were unable to

22   go to their polling place on election day.

23   Q.  Let's shift then to page 2 of Exhibit Number 21.  How

24   many voters can an agent deliver ballots to?

25   A.  An agent can deliver ballots for up to three voters per

1    election.

2    Q.  Let's walk through then the steps in this process that

3    we've talked a little bit about already.  We'll go to page 3

4    of Government Exhibit Number 21.  So what is the first step

5    in the process with respect to what the voter needs to do?

6    A.  So the voter needs to fill out and then give to their

7    agent an Absentee Ballot Application and then a Request for

8    Agent Delivery form.

9    Q.  Does the voter need to initiate the agent delivery

10   process?

11   A.  Yes.

12   Q.  All right.  I'm going to show you two exhibits now at

13   the same time.  Both of them have been admitted into

14   evidence.  All right.  The other exhibit I've pulled up is

15   Government Exhibit 21 and Government Exhibit Number 17.

16           Let's walk through Government Exhibit Number 17

17   now.  What is this form?

18   A.  This is the Request for Agent Delivery form that the

19   voter needs to fill out to initiate the agent delivery

20   process.

21   Q.  What are the instructions at the top of this page?

22   A.  It says that the voter is asking an agent to come and

23   pick up a ballot for them and then bring the ballot to the

24   voter, and then they'll vote, and then the voter will bring

25   the ballot to our office.

1    Q.  The qualifications that you covered with respect to the

2    agent, is that covered in the instructions on this page?

3    A.  Yes, it is.

4    Q.  Who fills out this form?

5    A.  The voter is the one to fill out the form.  If the voter

6    needs help filling out the form, they can have someone

7    assist them in filling out the form.

8    Q.  So in the first box on the top of the page that follows

9    after I -- it's between -- there's "I," and then there's a

10   box, and then "certify."  What goes in that first box?

11   A.  That is where the voter puts their name.

12   Q.  What is the next part of the form with the three

13   circles?

14   A.  So that is the voter must choose which reason, which

15   qualification they meet for the agent delivery process, and

16   they would check the box for which one; and if their choice

17   was either the first one, they need to put the name of the

18   nursing home where they're at; or if it's the second one,

19   they also need to put the name of the facility where they

20   are at.

21

22

23

24

25

1    Q.  All right.  So if we have "I," voter, and then they mark

2    one of the special situations, the form then goes on to say,

3    "and request that the auditor or clerk provide an absentee

4    ballot in a sealed transmittal envelope to my agent."  And

5    then there's another box sort of midway down the page.

6    Whose name goes in that second box?

7    A.  That is the name then of the agent that the voter is

8    designating.

9    Q.  And with the final part of the form, "for delivery to me

10   during the seven days before the election or before

11   2:00 p.m. on election day.  I certify that I have a

12   preexisting relationship with this person."  Who is making

13   that certification?

14   A.  The voter.

15   Q.  Finally, whose signature goes in the bottom of the form?

16   A.  So the voter would then sign and date.  If the voter is

17   unable to sign, they could have someone help them sign or

18   sign on their behalf.  If that does happen, the person who

19   is signing on behalf of the voter needs to note that on the

20   form as well.

21   Q.  And so what is the voter certifying by submitting this

22   paper to election officials?

23   A.  They are certifying that they meet one of the three

24   criteria for agent delivery and that they are designating a

25   specific person for the process -- to be their agent.

1   Q.  Let's move then to Government Exhibit Number 18, which

2   has already been admitted into evidence.  What is Government

3   Exhibit Number 18?

4   A.  This is the 2020 Absentee Ballot Application.

5   Q.  Whose information goes on this form?

6   A.  The voter's information goes on this form.

7   Q.  And what types of information does this application ask

8   of the voter?

9   A.  So it asks them what ballot the -- what election the

10  voter wants a ballot for.  It asks for their name, their

11  birth date, the county that they live in, their email, their

12  address, if they wanted the ballot mailed to them, what that

13  address would be.  And then the voter certifies that they

14  meet the qualifications at the bottom, and then they sign

15  and date.

16  Q.  All right.  So the certification that comes from the

17  voter is in which box there on this form?

18  A.  In Box 7.

19  Q.  And, again, who signs at the bottom near the X in Box 7?

20  A.  The voter signs there.  And like the other form, if the

21  voter has trouble signing or can't sign, they can have

22  someone sign on their behalf; and then that person needs to

23  denote that they are signing on behalf of the voter.

24  Q.  So let's circle back then to Government Exhibit

25  Number 21 on page 3.

1          So once the voter gives the agent those two pieces

2     of paper, what does the agent then do?

3     A.  So the agent would bring those pieces of paper to either

4     our office or the Hennepin County Government Center.  The

5     voter could like email or fax us the paperwork ahead of

6     time, if they choose.  Most of the time they just show up at

7     our office, and then they would present that to our staff

8     member at the front desk to initiate the agent delivery

9     process on our end.

10    Q.  So once an agent arrives at your office and interfaces

11    with the staff member, what happens?

12    A.  So once the paperwork is presented to a staff member, we

13    then fill out an agent delivery pick-up and return log where

14    we record the name of the agent, the agent's address, and

15    then the names and addresses of all of the voters that they

16    are picking up ballots for.  And also on that form we note

17    the date that they are going to -- that they are picking up

18    the ballot, and then the agent signs the ballot -- signs the

19    form.

20    Q.  And at some point do they receive then the absentee

21    ballot?

22    A.  Yes.  So once all this is being -- the form is being

23    filled out, other staff members are processing the Absentee

24    Ballot Application in our voter systems called the Statewide

25    Voter Registration System.  And once that has been

1    processed, the last step of the process is that we give the

2    agent the ballots, or one ballot, up to three, in sealed

3    envelopes that they can then bring to the voter.

4    Q.  So what is the agent supposed to do per the agent

5    delivery process once they receive those blank ballots?

6    A.  Once they have received the ballots, they are then

7    supposed to bring the ballot or ballots to the agents that

8    they are -- sorry -- to the voters that they are serving.

9    Q.  Who is responsible for filling out the ballot?

10   A.  The voter is.

11   Q.  I'm going to show you what's already been admitted into

12   evidence as Government Exhibit Number 19.  Can you tell the

13   members of the jury what they are seeing on their screen?

14   A.  So this is a signature envelope.  It's used in the

15   absentee voting process.  Along with this envelope, there

16   are some more envelopes, but ultimately the voter's ballot

17   is put inside this signature envelope, and then the various

18   boxes on the front of the signature envelope are filled out

19   by the voter.  And then at the bottom there is a -- the

20   bottom half is a witness section.  The witness would fill

21   that out.  In 2020 there was no witness section.  The

22   witness requirement was removed for registered voters

23   because of COVID, but normally they would need to have a

24   witness as well.

25   Q.  So if one were actually voting, they would receive as

1    part of their materials an actual envelope; is that correct?

2    A.  Correct.

3    Q.  Are we seeing a photocopy on the screen today?

4    A.  Yes.

5    Q.  All right.  So you mentioned a couple parts of these

6    forms.  Let me make those a little bit larger, and we will

7    talk about those.  So in the top half where it reads, "Voter

8    must complete this section," whose information goes in that

9    section of the envelope?

10   A.  That would be the voter section for these, because when

11   we process the application in our, in the SVRS system, we

12   will print out a barcode label, which will have the voter's

13   name and address, and where -- in that section is where we

14   put that label.

15   Q.  What is the reference to "Agent name" on the envelope?

16   A.  That is referencing the name of the agent that the voter

17   designated on the Request for Agent Delivery form.

18   Q.  And whose signature goes next to the X at the bottom of

19   this first box?

20   A.  The voter's signature goes there.

21   Q.  Is the envelope that we're seeing on the screen specific

22   to the agent delivery process for voting?

23   A.  Yes, it is.

24   Q.  How do you know that?

25   A.  Two reasons.  One, there in the top half it says "Agent

1    name."  And then in the bottom right-hand corner it will

2    say, "Signature Envelope - Agent Delivery, Registered."

3    Q.  So I'm going to highlight this bottom section under the

4    For Official Use Only.  Is that the place that you are

5    referencing?

6    A.  Yes.

7    Q.  All right.  So let's talk about what we've got on the

8    screen.  Who is responsible for filling out the For Official

9    Use Only section?

10   A.  The For Official Use section is filled out by members of

11   the absentee ballot board when they go to accept or reject

12   the ballot.

13   Q.  And what type of information goes in here?

14   A.  They would either check the box "accept" or "reject,"

15   and then they would initial.  If the ballot was rejected,

16   they would also write the reason why the ballot was

17   rejected.

18   Q.  At what phase of the election process and the voting

19   process is that rectangle used?

20   A.  This is used when the agent returns the ballot to our

21   office.  The ballot is then accepted or rejected either that

22   same day or the next day, depending on when -- what time we

23   get the ballot back.

24   Q.  Let's then jump to the middle of the envelope where it

25   says, "Witness must complete this section."  Whose

1   information goes here?

2   A.  That would be the person that the voter chose to be

3   their witness, would fill out that section and then sign it.

4   Q.  And I believe you testified about what happened with

5   respect to this situation during COVID.  Could you explain

6   to the members of the jury whether this needed to be filled

7   out for the August 11th primary election?

8   A.  This witness section for the August 11th primary did not

9   need to be filled out if the voter was registered to vote.

10  Q.  Can you tell the members of the jury what records are

11  retained by the city with respect to these election records?

12  A.  Sure.  So the city will retain the Request for Agent

13  Delivery form.  We retain the Absentee Ballot Application

14  itself.  We retain the agent pick-up and drop-off logs.  We

15  also retain the signature envelopes, and then we retain the

16  ballots themselves.

17  Q.  In the course of the city's business in maintaining

18  these records, are all of the materials kept together or do

19  you have them in separate places?

20  A.  They are all kept in our vault.  They are kept in

21  different boxes in the vault.  So we keep the ballots in

22  one, like, box.  We keep the signature envelopes in, like,

23  signature envelope boxes.  We keep the applications in an

24  application box.  And then the Request for Agent Delivery

25  form and the logs, we keep those in binders, which are also

1    stored in the vault.

2    Q.  So the ballots themselves, so what we saw in Government

3    Exhibit Number 16, once those are completed and turned in,

4    are they kept separate then from the rest of the materials

5    that have somebody's identifying information on them?

6    A.  Yes.  So during the -- in the last week of the election

7    is when the absentee ballot board will count all of the

8    absentee votes.  And the first step in that process is that

9    we separate the ballots from the signature envelopes that

10   have the voter's identifying information, so we don't -- we

11   can't trace back which ballot belongs to which voter, for

12   secrecy and privacy reasons.

13   Q.  Let's go then to the final page of Government

14   Exhibit 21, which is page 4.  When is the agent delivery

15   process available in the State of Minnesota?

16   A.  The agent delivery process starts a week prior to

17   election day.

18   Q.  When are ballots due then?

19   A.  The agent has to return the ballot to our office by

20   3 p.m. on election day.

21   Q.  All right.  Does the City of Minneapolis maintain

22   records of material submitted during the agent delivery

23   process for the August 11th, 2020, primary election?

24   A.  Yes, we do.

25   Q.  All right.  If you could take a look at -- actually,

1    before we get to the papers in front of you, I'll ask one

2    more question.  Does the City of Minneapolis have records

3    that Muse Mohamed acted as an agent in the agent delivery

4    process for the August 11th, 2020, primary?

5    A.  Yes, we do.

6    Q.  What records does the city have for Muse Mohamed?

7    A.  We have the Request for Agent Delivery for the three

8    voters that designated him as their agent.  We have three --

9    we have those voters' three Absentee Ballot Applications.

10   And we have an agent pick-up log where we've recorded all of

11   those names and the agent's information.  And then we have

12   two signature envelopes for two of the voters that he

13   served.

14   Q.  All right.  So I brought a binder up to you once you sat

15   down, and that has Government Exhibits 6 through 14.  Could

16   you please page through, and I have some questions for you

17   about those, but just familiarize yourself with them first,

18   please.

19   A.  Yes.

20   Q.  All right.  Do you recognize these documents?

21   A.  Yes.

22   Q.  Can you tell us what they are?

23   A.  These are the Request for Agent Delivery forms, the

24   agent ballot -- sorry -- the agent pick-up and drop-off

25   logs, the applications and the signature envelopes for the

1    voters that Muse Mohamed served as the agent.

2    Q.  Are these true and accurate copies of what is in the

3    city's election records?

4    A.  Yes.

5         MS. MUNOZ:  Your Honor, the government moves to

6    admit Government Exhibits 6 through 14 at this time.

7         THE COURT:  Any objection?

8         MR. CLIPPERT:  No objection.

9         THE COURT:  6 through 14 are admitted and may be

10   published.

11        MS. MUNOZ:  Thank you, Your Honor.

12   BY MS. MUNOZ:

13   Q.  All right.  Mr. Martin, let's begin with Government

14   Exhibit Number 6.  I'll pull that up on the screen.  Can you

15   tell the members of the jury what we see on the screen right

16   now?

17   A.  This is the agent ballot return and pick-up log that is

18   filled out, which documents the name of the agent and then

19   the voters that the agent is serving.

20   Q.  Where is this log maintained?

21   A.  This is maintained at our elections office, and then

22   also Hennepin County will maintain one for the agents that

23   they process.

24   Q.  And so did this come from the records at 980 East

25   Hennepin?

1    A.   Yes.

2    Q.   At what point in the agent delivery process is this log

3    used?  Can you please remind us?

4    A.   So this log is used and filled out when the agent comes

5    to our office with the voter's Absentee Ballot Application

6    and their Request for Agent Delivery form.

7    Q.   Let's start at the top of the paper where there's

8    "Agent" and a line.  Whose information goes there?

9    A.   That is the name of the agent would go there.

10   Q.   And who is the agent for this log in Government

11   Exhibit 6?

12   A.   Muse Mohamed.

13   Q.   Let's cover this first box where we have Date of Pick-Up

14   of 8/5/2020.  What is the information that we're seeing here

15   in the first box?

16   A.   So in the first box, the Date of Pick-Up, is when the

17   agent comes to pick up the ballot for the voter.

18            The Agent Name is where the agent's name is

19   written.

20            The Agent Address is the address that the agent,

21   that belongs to the agent.

22            The Agent Signature is where the agent signs.

23            And then Absent Voter Name is the name of the

24   voter that they are picking up a ballot for.

25            Absent Voter Address is the address for the voter

1    that they are picking up a ballot for.

2              And then the Sign/Date of Drop-Off is the date

3    when the agent is returning the ballot, and then they also

4    have to sign again.

5    Q.  So does the agent sign this paper on two occasions?

6    A.  Yes.

7    Q.  And what are those two occasions?

8    A.  They will sign it when they are picking up a ballot, and

9    then they would sign it when they come back to our office to

10   drop off the ballot.

11   Q.  So looking at this agent return log for Muse Mohamed,

12   how many ballots did Muse Mohamed pick up?

13   A.  Three.

14   Q.  And who were they for?

15   A.  The ballots were picked up for Nasro Jama, for Sakariye

16   Ahmed and then for Abdiriman Muse.

17   Q.  And is Mr. Ahmed the second box here?

18   A.  Yes.

19   Q.  All right.  Does the City of Minneapolis have a record

20   of Mr. Mohamed returning a ballot for Mr. Ahmed?

21   A.  Yes.

22   Q.  And where do we see that?

23   A.  That is on the other side of Exhibit 6.

24   Q.  Let's go to page 2 then of Government Exhibit 6.  Can

25   you tell the grand jury what -- I'm sorry.  Can you please

1    tell the members of the jury what is documented on page 2?

2    A.  On the second page of Exhibit 6, this is -- it documents

3    when Muse Mohamed dropped off the ballot for Mr. Ahmed.

4    Q.  So in looking at the total of Government Exhibit 6, how

5    many ballots did Muse Mohamed pick up?

6    A.  Three.

7    Q.  How many ballots did Muse Mohamed turn back in?

8    A.  Two.

9    Q.  And on what days did Muse Mohamed pick up the ballots,

10   all three of the ballots?

11   A.  He picked up all three ballots on August 5th.

12   Q.  What date did he turn Nasro Jama's ballot in?

13   A.  August 11th.

14   Q.  And going to page 2 of Government Exhibit 6, what date

15   did Muse Mohamed turn in Mr. Ahmed's ballot?

16   A.  August 6th.

17   Q.  Let's turn now to a set of exhibits.  We'll go to

18   Government Exhibits 7, 8 and 9.  Are these the materials

19   that were in the city's election records for Nasro Jama?

20   A.  Yes.

21   Q.  Let's start with Number 7.  What is on the screen in

22   front of us?

23   A.  This is Nasro Jama's Request for Agent Delivery form.

24   Q.  What is the voter name that was put on this paper?

25   A.  Nasro Jama.

1    Q.  And what is the reason that's being provided for the

2    need for agent delivery?

3    A.  That they would have difficulty getting to the polls

4    because of incapacitating health reasons or they have a

5    disability.

6    Q.  And who is identified as the agent for Nasro Jama?

7    A.  Muse Mohamed.

8    Q.  Going to Government Exhibit Number 8, what is Government

9    Exhibit Number 8?

10   A.  Number 8 is Nasro Jama's Absentee Ballot Application.

11   Q.  Is this signed by -- is this document signed?

12   A.  Yes.

13   Q.  And is it dated?

14   A.  Yes.

15   Q.  What is the date on this application?

16   A.  It looks like 7/13/20.

17   Q.  Was this application turned into election officials?

18   A.  Yes.

19   Q.  How do you know that?

20   A.  There is a "received" date stamp on the, in the box of

21   Box 7.  Also, the official use section is filled out.  And

22   then towards the top of the application there is a barcode

23   label, and then handwritten above Minnesota is the word

24   "Agent."

25   Q.  All right.  Let's take those in reverse order here.  So

1  I'm highlighting the top of the screen where there's

2  handwriting that says "Agent."  Who puts that writing on the

3  paper?

4  A.  That is either myself or one of the staff who helps with

5  the agent delivery process.

6  Q.  And at what point in time does that handwriting go on

7  the piece of paper?

8  A.  When we receive the application and when we're about to

9  process it.

10  Q.  You also testified about a barcode and a sticker.  Is

11  that what we see on the upper right-hand corner of the

12  paper?

13  A.  Yes.

14  Q.  And where does that information get generated from?

15  A.  That is generated from the SVRS system, and that is

16  their application label, and each voter would have a unique

17  barcode assigned to their record.

18  Q.  All right.  Turning to page -- or Box Number 7, is this

19  where the stamp appears from your office?

20  A.  Yes.

21  Q.  And what does the stamp signify?

22  A.  It signifies that we have received the Absentee Ballot

23  Application and the date that we received it.

24  Q.  And what date was this application received?

25  A.  August 5th of 2020.

1   Q.  Let's go to the bottom part of the form where there's

2   the official use section.  What does this section tell us

3   about when the application was received?

4   A.  It tells us that it was received on August 5th.

5   Q.  And does it convey whether or not a ballot was issued?

6   A.  Yes.  It also issued on August 5th.

7   Q.  And who are the initials?

8   A.  That is the initials of the staff member who processed

9   this application.

10  Q.  Okay.  And in the typed box, sort of in the middle of

11  what we've highlighted here, what does the M stand for?

12  A.  M stands for municipal, since it was issued by a city.

13  Q.  And does it include information about the precinct and

14  school district?

15  A.  Yes.

16  Q.  And is that handwritten in by election officials --

17  A.  Yes.

18  Q.  -- or somebody on your team?

19  A.  Yes.  Correct.

20  Q.  Let's go to Government Exhibit Number 9.  What do we see

21  in Government Exhibit Number 9?

22  A.  So this is the signature envelope associated with Nasro

23  Jama.

24  Q.  Who is listed as the agent on the signature envelope?

25  A.  Mohamed Muse -- or Muse Mohamed.  Sorry.

1    Q.  And let's go here and the Agent name.  What is actually

2    written in the Agent name?

3    A.  His first name Muse.

4    Q.  What is the voter signifying here when they signed in

5    the box?

6    A.  They are signifying that this is their ballot and that

7    they've filled it out.

8    Q.  Who is listed as the witness in Government Exhibit

9    Number 9?

10   A.  The witness is listed as Mustafa Hassan.

11   Q.  And is that -- should that be the witness's address

12   that's written in the address section of this part of the

13   envelope?

14   A.  Yes.

15   Q.  And who is then supposed to sign by the X?

16   A.  The witness.

17   Q.  In looking at Government Exhibit Number 9, can you tell

18   whether or not this envelope was turned into election

19   officials?

20   A.  Yes, it was.

21   Q.  And how do you know that?

22   A.  Because the Official Use section was filled out.

23   Q.  All right.  Let's turn to that section.  So can you

24   explain for the jury what is -- what the handwriting is on

25   this envelope?

1    A.  So this envelope was initially accepted by two members

2    of our absentee ballot board on August 11th.  However,

3    during the course of the day we -- I got word from Hennepin

4    County elections that this voter had also gone --

5                MR. CLIPPERT:  Objection.  Hearsay.

6                THE COURT:  Sustained.

7    BY MS. MUNOZ:

8    Q.  Let's start with the first -- I will ask a new question.

9    What is the marking on the "accepted" part of this section

10   of the envelope?

11   A.  It was an X, and then it was crossed out.

12   Q.  Okay.  Was this ballot ultimately accepted?

13   A.  No.

14   Q.  Why?

15   A.  Because the voter had voted on election day as well.

16   Q.  What are the sets of writing on the line after "reason"?

17   A.  Already voted and also -- sorry.  That is the initials

18   of the two members of the absentee ballot board who

19   inspected this envelope.

20   Q.  Okay.  So just to be clear, on the line behind "reason,"

21   are those the initials?

22   A.  Yes.

23   Q.  And then what is the handwriting underneath the box?

24   A.  Underneath the box is the reason for why it was

25   rejected.

1    Q.  And why was it rejected?

2    A.  Because the person already voted.

3    Q.  Let's turn to Government Exhibits Number 10 and 11 next.

4    Are these the materials in the city's election records for

5    Abdiriman Muse?

6    A.  Yes.

7              THE COURT:  One moment.  Thank you.

8              MS. MUNOZ:  We're going to take just one moment

9    here.

10             Thank you, sir.

11   BY MS. MUNOZ:

12   Q.  So turning to Government Exhibit Number 10, who is the

13   voter identified on Government Exhibit 10?

14   A.  Abdiriman Muse.

15   Q.  What is the reason that's being provided for the need

16   for agent delivery?

17   A.  That they would have difficulty getting to the polls

18   because of incapacitating health reason or disability.

19   Q.  Who is the agent that's identified in Government

20   Exhibit 10?

21   A.  Muse Mohamed.

22   Q.  And who would be the person to sign or who should have a

23   signature at the bottom of the form?

24   A.  The voter.

25   Q.  On what date was this signed?

1    A.  August 5th.

2    Q.  Turning to Government Exhibit Number 11, what do we see

3    here?

4    A.  This is Abdiriman Muse's Absentee Ballot Application.

5    Q.  Was this application signed and dated?

6    A.  Yes.

7    Q.  And what date is on this application?

8    A.  July 3rd of 2020.

9    Q.  Was this application turned in?

10   A.  Yes.

11   Q.  How do you know that?

12   A.  Like the other, it has a date stamp when it was

13   received, and then towards the top it has handwritten

14   "Agent" and then our barcode label, and then the official

15   use section was also filled out.

16   Q.  So turning and focusing on the official use section, on

17   what date was this application received?

18   A.  August 5th.

19   Q.  And was a ballot issued?

20   A.  Yes.

21   Q.  What date was the ballot issued?

22   A.  Also August 5th.

23   Q.  And then both of those dates are in 2020; is that right?

24   A.  Yes.

25   Q.  Did the City of Minneapolis's election records contain a

1   signature envelope for this voter?

2   A.  No.

3   Q.  What does that tell you about whether or not a ballot

4   was turned in?

5   A.  That tells us that a ballot was not turned in by this

6   voter.

7   Q.  All right.  Let's shift now to Exhibits 12, 13 and 14.

8   Are these the materials that were in the city's election

9   records for Sakariye Ahmed?

10  A.  Yes.

11  Q.  Let's start with 12.  All right.  What is 12?

12  A.  12 is Sakariye Ahmed's Request for Agent Delivery.

13  Q.  What is the reason that's being provided for the need to

14  use the agent delivery process?

15  A.  That he would have difficulty getting to the polls

16  because of an incapacitating health reason or disability.

17  Q.  And is this request also signed and dated?

18  A.  Yes.

19  Q.  What is the date on this one?

20  A.  August 5th of 2020.

21  Q.  Let's go to Government Exhibit Number 13.  Who is the

22  voter for this document?

23  A.  Sakariye Ahmed.

24  Q.  Is this document signed and dated?

25  A.  Yes.

1   Q.  And what is the date on this one?

2   A.  June 24th of 2020.

3   Q.  Was this application turned in?

4   A.  Yes.

5   Q.  And how do we know that?

6   A.  Like the others, there is a date stamp in the box around

7   Box 7.  Towards the top there is handwritten "Agent" and

8   then also the barcode label, and at the bottom the official

9   use section is filled out.

10  Q.  Let's turn our attention to the bottom of Exhibit 13.

11  What was the date that this application was received?

12  A.  August 5th of 2020.

13  Q.  And what date -- or did a ballot issue in response to

14  this application?

15  A.  Yes.

16  Q.  And on what date did that ballot issue?

17  A.  August 5th of 2020.

18  Q.  Moving to Government Exhibit Number 14, what is this?

19  A.  This is Sakariye Ahmed's signature envelope.

20  Q.  Who is listed as the agent on this envelope?

21  A.  Muse Mohamed.

22  Q.  Who is listed as a witness?

23  A.  No one.

24  Q.  Okay.  Was a witness required at this time?

25  A.  No.

1    Q.  Turning to the Official Use section, can you tell us

2    what happened with this envelope and the ballot?

3    A.  This ballot was accepted.  The accepted box was checked.

4    And the two initials are the two members of our absentee

5    ballot board who inspected and then accepted this ballot.

6            MS. MUNOZ:  Your Honor, if I may have one moment?

7            THE COURT:  You may.

8                     (Counsel confer)

9    BY MS. MUNOZ:

10   Q.  Mr. Martin, we've been talking a lot about the agent

11   delivery process.  Could you explain to the jury how

12   frequently the agent delivery process is used in elections,

13   in your experience?

14   A.  It's not frequently used.  It's not -- so for the 2020

15   primary we had a little over 500 agent ballots that were

16   requested.  In total, there was over 84,000 absentee ballots

17   that we counted.  So in the grand scheme of things, it is

18   not a lot, but it is a lot -- in 2020 for the 2020 primary

19   we had more than we had in previous years.

20   Q.  How do the numbers for the use of the agent delivery

21   process in the August 2020 primary compare to the

22   November 2020 general election?

23   A.  They -- in the August 2020 primary the numbers far

24   exceeded the numbers in the November general election by

25   possibly a factor of 3 or 4.

1    Q.  All right.

2              MS. MUNOZ:  Your Honor, I have no further

3    questions at this time.  Thank you.

4              THE COURT:  All right.  At this time we're going

5    to take an afternoon break.  So I'll ask you to come back at

6    3:30, and we'll resume with cross-examination by

7    Mr. Clippert.

8              All rise for the jury.

9              (Recess taken at 3:14 p.m. till 3:33 p.m.)

10                        **IN OPEN COURT**

11                        **(JURY PRESENT)**

12             THE COURT:  You may all be seated.

13             And, Mr. Clippert, you may inquire.  The podium.

14             MR. CLIPPERT:  One second, Your Honor.

15             THE COURT:  All right.  From the podium.

16             MR. CLIPPERT:  Pardon me?

17             THE COURT:  From the podium.

18             MR. CLIPPERT:  Yes.

19             THE COURT:  Thank you.

20                       <u>CROSS-EXAMINATION</u>

21   BY MR. CLIPPERT:

22   Q.  Mr. Martin, I want to just follow up on a couple of

23   things.  I think in August of 2020 we were kind of in the

24   middle of the COVID situation, right?

25   A.  Yes.

1    Q.  So we had some changes in the processing of ballots,

2    right?

3    A.  Yes.

4    Q.  That included not having to have a witness signature on

5    the envelopes, right?

6    A.  Correct.  For registered voters.

7    Q.  Right.  For the registered voters, correct.  And then

8    was the witness requirement also done away with on the

9    absentee ballot request?

10   A.  No.

11   Q.  There wasn't one in that anyway, right?

12   A.  No.

13   Q.  Okay.  But when you do an absentee ballot request, there

14   are some guardrails to protect to make sure the person who

15   is requesting the ballot is actually that person, right?

16   A.  Yes.

17   Q.  And so the voter has to either put in a driver's license

18   number; is that right?

19   A.  Correct.

20   Q.  Or a social security number, right?

21   A.  Yes.

22   Q.  And a lot of secretary of state's voter information is

23   available to the public, right?

24   A.  Yes.

25   Q.  I think you can go down to the office and pay a fee and

1    get certain information about a voter, right?

2    A.  Yes, certain information.  Correct.

3    Q.  Just what information is available?

4    A.  Their name, their year of birth, their address and their

5    first, last and middle name, also their voter history that

6    you can request, and their phone number I believe is also

7    publicly available.

8    Q.  Okay.  And the voter history is in whatever the last

9    election they voted in out of the last five?

10   A.  It is, it is usually the last four or five.  And you can

11   customize, like if you only care about even your

12   presidential elections, then you can ask that, or if you

13   care about municipal elections, yes.

14   Q.  But the way the person voted, who the candidates that

15   person voted for, is not publicly available, right?

16   A.  Correct.  That is secret.

17   Q.  Right.  And then the social security number and the

18   driver's -- or the driver's license number, that's not

19   publicly available?

20   A.  Correct; That is not public.

21   Q.  When you've talked about voters -- allowing voters to

22   have other people fill out forms and sign forms for them,

23   can that include the agent?

24   A.  Yes.  It's -- yes.

25   Q.  Yeah.  And you talked about someone whose ballot was

1    rejected because they voted in person.  There's nothing

2    wrong with submitting an absentee ballot and voting in

3    person, right?

4    A.  No.

5    Q.  Because you have a system in place to check that, right?

6    A.  Yes.

7    Q.  And people forget they vote absentee, right?

8    A.  Yes.

9    Q.  And people sometimes change their mind on who they voted

10   for, so they go in and vote in person?

11   A.  Yes.

12   Q.  Okay.  You hesitated a little bit on that one.  But

13   there's nothing wrong or shocking about having someone

14   submit an absentee voted ballot and then vote in person?

15   A.  No.  There are some rules which prevent you from

16   changing your vote at certain points in time, but no.

17   Q.  Just a couple more things.  You had a meeting with an

18   FBI agent and some of the prosecutors, right?

19   A.  Yes.

20   Q.  And you said that there are times where the ballots and

21   the signatures don't always equal out.

22   A.  Like the -- what do you mean by that?

23   Q.  I'm sorry.  The ballots.  The absentee ballots and the

24   signature envelopes.

25   A.  Oh, yes.

1    Q.  I'm sorry.  That was a vague question.  They are not

2    always equal, right?

3    A.  Correct.

4    Q.  Because it's a human process, right?

5    A.  Yes.

6    Q.  Because you're pulling the ballots apart and pulling the

7    signature envelopes apart.  You are storing them in

8    different places.  Then you are bringing them back together,

9    it sounds like.  Is that right?

10   A.  That is correct.  That's usually not the reason why they

11   don't balance out.

12   Q.  But they don't always balance out, though?

13   A.  Occasionally voters will submit an envelope with no

14   ballot in them.  Correct.

15   Q.  We were able to discuss some of the terms here, but the

16   one I haven't heard discussed or defined is this preexisting

17   relationship.  Is that defined anywhere?

18   A.  No.

19   Q.  Okay.  So it's just sort of for the voter and the agent

20   to figure out whether they have a preexisting relationship?

21   A.  Correct.

22   Q.  And how did the COVID-19 pandemic impact the absentee

23   voting in Hennepin County in the primary?

24   A.  Sure.  Because of COVID, both in Minneapolis and in

25   Hennepin County and statewide, there was a massive increase

1    in absentee voting.

2    Q.  All right.  Just I want to go back on that one thing.

3    So you have received blank signature envelopes or empty?

4    A.  Yes.  Occasionally.  It's very rare.  In the last year,

5    like for 2020, it may have been one or two that occasionally

6    a voter will return their signature envelope, when the

7    absentee ballot board goes to open up the signature envelope

8    to extract the ballot out, that there is no ballot in that

9    signature envelope.  Again, it's one or two out of the

10   200,000-plus absentee ballots that we tabulated for both the

11   primary and the general last year.  So it's exceedingly rare

12   that this happens.

13   Q.  But if I -- so say I submit my -- thinking I'm going to

14   submit my absentee ballot, put it in my signature envelope,

15   you know, I have a dull moment and I forget to put my ballot

16   in that envelope, I could still vote in person, right,

17   because there's no ballot cast?

18   A.  It depends.  No, most likely no.

19         So in that scenario, and you mailed back your

20   signature envelope, and once we got that signature envelope,

21   the absentee ballot board would accept and reject the

22   signature envelope, because we don't know that there's a

23   ballot inside.  If it met all of the criteria, we would

24   accept it and then in our system it would say that it was

25   accepted.

1            If you happen to then realize that you forgot to

2      submit your ballot and went on election day instead, in the

3      roster that you sign on, the electronic roster, next to your

4      name would have -- like it would say AB on it, which

5      designates that you voted absentee, and the election judge

6      would not allow you to vote regardless.  And then we would

7      only find out after the fact that there was a signature

8      envelope which had no ballot in it.  We, of course, would

9      not be able to trace it back to the specific person.  We

10     would have no way of knowing.  You would have no way of

11     knowing unless you happen to remember.

12           But you would not be allowed to vote on election

13     day since you, once in that final week of the election, when

14     the agent delivery process is happening, also when we are

15     opening up our absentee ballots/signature envelopes to

16     tabulate the ballots, once you have submitted a ballot, you

17     cannot essentially claw back, which is the process of saying

18     that "I changed my mind.  I want to vote again."

19     Essentially, if it's -- if you have an accepted ballot

20     starting the week prior, your vote is locked in.  If you --

21     Q.  Okay.  All right.  And so -- okay.  All right.  So you

22     described a situation where you can't claw back your ballot.

23     But, again, if I go and vote in person and the records show

24     an absentee ballot, my in-person vote trumps the absentee

25     ballot.

1    A.  No.  So only on election day itself.

2    Q.  Right.  Okay.  Yes.  I'm sorry.  Thank you for

3    clarifying.  So if I go on the primary day and vote in

4    person --

5    A.  Sorry.  I -- sorry.  I should clarify.  So only if you

6    turned in your absentee ballot on election day itself and

7    then also went to vote on election day, then your election

8    day vote would supersede the absentee ballot.  If you turned

9    in your absentee ballot, say, the Monday before the election

10   and it was accepted and then you went on election day to

11   vote, the roster would say you voted absentee, and you would

12   not be allowed to vote.

13   Q.  Okay.  So just so -- I guess I'm just not quite there

14   yet.  Sorry.  But one of the ballots we talked about was

15   someone whose signature envelope was accepted and then later

16   rejected because she voted in person.

17   A.  Yes.

18   Q.  And was that acceptable because of the timing of the

19   ballot?

20   A.  Yes.  Correct.  So that was acceptable because the

21   ballot was returned to us on election day.  We initially

22   accepted it.  Throughout the course of election day at set

23   times we get updated lists from Hennepin County elections,

24   which tells us anyone who has an accepted absentee ballot

25   that was accepted on election day and then who also voted on

1    election day.  So then we can reject their absentee ballot,

2    so they don't essentially cast two votes.

3    Q.  All right.  Thank you, Mr. Martin.

4              MR. CLIPPERT:  No further questions.

5              THE COURT:  Ms. Munoz, redirect?

6              MS. MUNOZ:  Yes, Your Honor.  Thank you.  Thank

7    you, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MS. MUNOZ:

10   Q.  Mr. Martin, you were asked about what happens if -- or

11   could the agent fill out these forms for the voter.  Do you

12   remember that question?

13   A.  Yes.

14   Q.  If the agent were to do that and fill out either the

15   application or the Request for Agent Delivery, what else

16   would the agent have to do to communicate that it was the

17   agent that did the filling out and not the voter him or

18   herself?

19   A.  So if the agent signed on behalf of the voter, the agent

20   would need to denote that they signed on behalf of someone,

21   on behalf of the voter.

22   Q.  And that would be written on -- that should be written

23   on the form itself?

24   A.  Yes.  Underneath or next to the signature.

25   Q.  We've heard a little bit this morning about COVID and

1    impacts of COVID.  So before COVID you had to have a

2    preexisting relationship between the agent and the voter; is

3    that correct?

4    A.  Yes.

5    Q.  Did that change with COVID?

6    A.  No.

7    Q.  Before COVID the voter needed to ask the agent to act as

8    the agent; is that correct?

9    A.  Yes.

10   Q.  Did COVID change that?

11   A.  No.

12   Q.  Before COVID if the agent brought the paperwork to the

13   election office -- and by "paperwork" I mean the Absentee

14   Ballot Application and the Request for Agent Delivery -- is

15   your staff trusting that that agent has the permission of

16   the voter to pick up and deliver a ballot?

17   A.  Yes.

18   Q.  Did that reliance on the agent and trust of that agent

19   change with COVID?

20   A.  No.

21   Q.  And was it still required -- so I guess before COVID the

22   voter was the one that had to vote the ballot; is that

23   correct?

24   A.  Yes.

25   Q.  Did that change with COVID?

1    A.  No.

2    Q.  So the voter still has to vote the ballot even during

3    COVID?

4    A.  Correct.  Yes.

5            MS. MUNOZ:  All right.  Your Honor, I have no

6    further questions.

7            THE COURT:  Mr. Clippert, anything?

8                    RECROSS-EXAMINATION

9    BY MR. CLIPPERT:

10   Q.  Just going back to this agent signing on behalf of the

11   voter, would that be, for example, on the bottom of page or

12   Exhibit 10 and the Request for Agent Delivery of Absentee

13   Ballot?

14   A.  Yes.

15   Q.  So just tell me in this form or in the instructions

16   where it says that.

17   A.  In the instructions it does not say that.  On the back

18   of the Absentee Ballot Application form, I believe there is

19   language about if the voter needs assistance filling out

20   their Absentee Ballot Application.

21   Q.  Okay.  But that's not part of the exhibit before the

22   court?

23   A.  Correct.

24           MR. CLIPPERT:  Nothing further.

25           MS. MUNOZ:  Nothing further, Your Honor.  Thank

1    you.

2            THE COURT:  You may step down, sir.  Thank you.

3            THE WITNESS:  Thank you.

4            THE COURT:  And the government may call its next

5    witness.

6            MS. MUNOZ:  Thank you, Your Honor.  The government

7    calls Nasro Jama.

8            THE COURT:  We have a separate interpreter, so I

9    will have the interpreter come up.  So first I'll have the

10   interpreter sworn.

11           Can you stay standing for one moment?  Thank you.

12           The interpreter be sworn, please.

13           COURTROOM DEPUTY:  Raise your right hand.

14                   (Oath administered)

15           THE INTERPRETER:  Yes, I do.

16           THE COURT:  Thank you.  Could you state your name

17   for the record, sir?

18           THE INTERPRETER:  Yes, Your Honor.  My name is

19   Said Yusuf.  It's spelled S-A-I-D.  Last name Y-U-S-U-F.

20           THE COURT:  Thank you.

21           Ms. Jama, could you raise your right hand for me?

22                      NASRO JAMA,

23   called on behalf of the government, was duly sworn, was

24   examined and testified as follows:

25           THE WITNESS (through interpreter):  Yes.

1          THE COURT:  Thank you.  You may be seated.

2          MS. MUNOZ:  Thank you.

3          Mr. Yusuf, would you like to sit?

4          THE INTERPRETER:  Standing would be fine with me.

5          MS. MUNOZ:  Okay.

6          THE INTERPRETER:  I like standing.

7          MS. MUNOZ:  Okay.  Is that okay with the court?

8          THE COURT:  That's fine.

9          Ms. Jama, can you state and spell both your first

10    and last name for the record, please?

11          THE WITNESS (through interpreter):  That's

12    N-A-S-R-O.  J-A-M-A.

13          THE COURT:  You may inquire.

14          MS. MUNOZ:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16    BY MS. MUNOZ:

17    Q.  Good afternoon, Ms. Jama.

18    A.  Good afternoon.

19    Q.  Can you please tell the members of the jury how old you

20    are?

21    A.  I was born in 01/01/1976.

22    Q.  Can you please tell the members of the jury how far you

23    went in school?

24    A.  Only fourth grade.  ESL fourth grade.

25          JUROR:  Could you have him stand closer to the

1    microphone?

2              THE COURT:  The interpreter?

3              JUROR:  Yes, the interpreter.

4              THE COURT:  Yes.

5              Sir, you can bring it toward you or you -- yes.

6    Thank you.

7              THE INTERPRETER:  Thank you.

8    BY MS. MUNOZ:

9    Q.  I will ask the question one -- just the last question

10   one more time.  Ms. Jama, can you please tell us how far you

11   went in school?

12   A.  The fourth grade in ESL.

13   Q.  Do you work outside the home, Ms. Jama?

14   A.  I used to work, but not now.

15   Q.  Could you tell the members of the jury what city you

16   live in right now?

17   A.  Lakeville, Minnesota.

18   Q.  Ms. Jama, I want to take you back to August of 2020.

19   Were you living in the City of Minneapolis at that time?

20   A.  Yes.

21   Q.  Do you remember what your address was in August of 2020?

22   A.  Yes.  3232 Grand Avenue South.

23   Q.  And that was in the City of Minneapolis; is that right?

24   A.  Yes.  Minnesota.

25   Q.  All right.  I'm going to show you a few exhibits that

1    have been admitted into evidence, and they're going to pop

2    up on the screen in front of you.

3            All right.  So the first number is Government

4    Exhibit Number 6, and this is called an Absentee Ballot

5    Agent Return Log.  I'm going to highlight a box, so it's a

6    little bit bigger on your screen.  And do you see in the

7    middle there's a line that says "Absent Voter Name"?

8    A.  Yes, I see.

9    Q.  I'm going to try and highlight here in yellow.  It says

10   Nasro Jama.  Do you see that space, ma'am?

11   A.  Yes, I see.

12   Q.  So there's an address underneath that's 3232 Grand

13   Avenue, Minneapolis, Minnesota.  Do you see that part?

14   A.  Yes.

15   Q.  And is that where you were living in August of 2020?

16   A.  Yes, I used to live there.

17   Q.  In the same spot in the Agent Name box there's another

18   name.  Muse Mohamed.

19   A.  Yes.

20   Q.  Do you know anyone named Muse Mohamed?

21   A.  No.

22   Q.  In August of 2020 did you ask Muse Mohamed to act as

23   your agent to pick up and drop off a ballot for you?

24   A.  No.

25   Q.  Did you ask anyone to pick up and drop off an absentee

1  ballot for you in August of 2020?

2  A.  No.

3  Q.  Did you vote in August of 2020 in the primary election

4  in the City of Minneapolis?

5  A.  I've never asked, you know, anybody to help me to and

6  help me to fill out or, you know, to be able to vote

7  absentee.  And I don't remember a hundred percent if I vote

8  in 2020 election, but what I'm sure is, you know, any time

9  I'm voting, including the presidential election, I go in a

10  public place, especially public schools, an open place and

11  cast my vote.

12  Q.  Ms. Jama, I have another exhibit to show you.  It will

13  be a new one on your screen.  And this one for purposes of

14  our record is Government Exhibit Number 7.

15          Ms. Jama, this form is called a Request for Agent

16  Delivery of Absentee Ballot.

17  A.  I already talked to you.  I don't remember that, no.

18  Every day I say no to you.

19  Q.  Okay.  Ms. Jama, we have to -- it's a little bit of a --

20          (Witness speaking simultaneously)

21          THE COURT:  Wait just one moment.

22          Go ahead.

23          THE WITNESS:  No.

24          (Witness speaking simultaneously)

25          THE COURT:  One moment.

1                    (Witness speaking simultaneously)

2              THE COURT:  Just a minute.  I need to hear the

3    interpreter.

4                    (Witness speaking simultaneously)

5              THE COURT:  Stop.  Wait.  I need to hear the

6    interpreter.

7              THE INTERPRETER:  Hold on.

8              THE WITNESS (through interpreter):  And I do have

9    ten children.  I come here like 11 o'clock this morning.  We

10   spoke before this incident on this issue, and, you know, I

11   told you many, many times.  And, you know, I don't have

12   anybody to cook the lunch for my kids.  I ask, you know, to

13   pick up my children from school.  And I kept coming.  And

14   you are asking me these questions many, many times.  I don't

15   know this guy.

16             MR. CLIPPERT:  I can't hear the interpreter.  Can

17   you speak up?

18             THE WITNESS (through interpreter):  I don't know

19   this person.  I told you many, many different times.

20   Whenever I go to vote, I go publicly and I go in person.  I

21   cast my vote.  And I told you please don't bother me.

22   Respect me.

23   BY MS. MUNOZ:

24   Q.  Ms. Jama, I have a few questions for you, and I will --

25   I will be efficient about my questions.  Okay?

1    A.  Okay.

2    Q.  And it's --

3    A.  Please don't ask me a question after today.

4    Q.  Ms. Jama, I will promise to ask my questions today very

5    efficiently.

6    A.  Okay.

7    Q.  And it's really important that we let the interpreter

8    interpret both for me and for the judge and for you.  Okay?

9    A.  Okay.

10   Q.  Okay.  Let's go back to Government Exhibit Number 7 on

11   your screen.  Your name is highlighted here in yellow.

12   A.  I see.

13   Q.  Is that your handwriting?

14   A.  I don't know who copy it.  I told you before.  I told

15   you before.  What can I do?

16   Q.  All right.  My next question, Ms. Jama, is in the

17   signature block down here that I'm making bigger here, did

18   you sign this form?

19   A.  No, I did not.  Another one.

20   Q.  Let's move to Government Exhibit Number 8.  And for

21   purposes of our record, this is the 2020 Minnesota Absentee

22   Ballot Application.

23          Ms. Jama, your name is on this paper in Box

24   Number 2.

25   A.  I see.

1    Q.  Do you see it?  Okay.  Did you fill out this

2    application?

3    A.  I told you before.  I went there; I was given a form; I

4    fill out; I drop it in the drop box; then I was given a

5    sticker, and I put my sticker on my chest, and I left.

6    That's what I told you.

7            Did you get this form from the election place?

8    Q.  Ms. Jama, I'm sorry.  This is -- it's a funny process

9    here that I'm supposed to ask the questions and you're

10   supposed to answer them.  Okay?

11   A.  I don't know this gentleman named Muse, and I don't know

12   how he get my application and my information.  You can ask

13   him.

14   Q.  I have one more paper to show you, Ms. Jama.  This is

15   Government Exhibit Number 9.  And I'm going to highlight

16   here.  There's a Voter Signature.  Did you sign this

17   envelope?

18   A.  No.

19   Q.  There's another section on this envelope with the name

20   Mustafa Hassan.  Do you see that area?

21   A.  The name?  I see the name, but I don't know the person.

22   Q.  Okay.  You beat me to it.  That was my next question.

23   Do you know someone named Mustafa Hassan?

24   A.  I don't know.  I don't know.

25   Q.  And so is it safe to -- did Mustafa Hassan watch you

1  vote in August of 2020?

2  A.  There was no Somali individual and person at the time I

3  was voting, casting my vote.

4  Q.  Did you ask Muse Mohamed to deliver a ballot to you?

5  A.  I told you before, no, no.  I don't know that individual

6  you are talking about.

7  Q.  Okay.

8          MS. MUNOZ:  Your Honor, I have no further

9  questions for Ms. Jama.

10          THE COURT:  Thank you.

11          Mr. Clippert, do you have any questions?

12          THE WITNESS (through interpreter):  Can we finish

13  this soon?  And please don't call back again.

14          THE COURT:  Can you say that again?

15          THE WITNESS (through interpreter):  Please call me

16  back in this courtroom again.

17          THE COURT:  Ms. Jama, Mr. Clippert has the

18  opportunity right now to ask you some questions.  So he's

19  allowed to do that under law.

20          THE WITNESS (through interpreter):  Yeah, as long

21  as I'm here, sitting here, I will answer the questions I'm

22  being asked.

23          THE COURT:  Thank you.

24          Mr. Clippert.

25

1        <u>CROSS-EXAMINATION</u>

2    BY MR. CLIPPERT:

3    Q.  Ms. Jama, I'm going to do my best to make this as

4    painless as possible for you.  Okay?

5    A.  Okay.

6    Q.  So you, first, you talked at one point with an FBI agent

7    and some others back on October 8th of 2021.  Does that

8    sound about right?

9    A.  The 2021?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And was that in your home, or was that at someone else's

13   office?

14   A.  Yeah, first time it was my home.  And then second time

15   it was in St. Paul courts.  And the third time was my home.

16   And the FBI agent, he introduce me to lady sitting in front

17   of me.  They were together.

18   Q.  Okay.  And what was your reaction to having the FBI show

19   up to your house?

20   A.  Okay.  I was so confused at that time because, you know,

21   they say come here.  I was working.  And I never had

22   interaction with the FBI, but even the police.  And they

23   came to me with a lot of papers and, you know, a recording

24   device and ask me questions.  And I told them that I don't

25   know this individual.

1    Q.  Okay.  And based on your reaction today, it doesn't

2    sound like -- I'm sorry.  Never mind.  I'm going to move on.

3            When the FBI shows up to your house, is that

4    something that is welcome or is it something that's scary?

5    A.  I was not scared because I knew that I was innocent and

6    I didn't do anything wrong.  And they just ask me questions,

7    and I answer their questions.

8    Q.  Okay.  Ms. Jama, thank you for your time.  I know you

9    have ten kids; is that right?

10   A.  Yeah, you know --

11           (Witness speaking simultaneously)

12           THE COURT:  Wait.  Wait.

13           THE WITNESS (through interpreter):  Yes.  You

14   know, some of them, they are in university even.  And the

15   one who is with me right now, my daughter, you know, she was

16   with me this morning and she got her walk today.

17           MR. CLIPPERT:  Nothing further.

18           THE COURT:  Ms. Munoz?

19           MS. MUNOZ:  No, Your Honor.  Thank you.

20           THE COURT:  Ms. Jama, you may step down.  Thank

21   you.

22           THE WITNESS (through interpreter):  Please, allow

23   to ask you, don't call me again, and don't ask me any

24   questions, and don't come to my home, please.  Thank you so

25   much.  And I don't know this guy you always talk about.

         1                THE COURT:  Thank you.  Thank you.  You are

         2     excused.

         3                The government may call its next witness.

         4                MS. SVENDSEN:  Thank you, Your Honor.  The

         5     United States calls Mustafa Hassan.

         6                THE INTERPRETER:  Your Honor, am I officially

         7     dismissed?

         8                THE COURT:  Does the government need him?

         9                MS. SVENDSEN:  No, Your Honor.

        10                THE COURT:  You are indeed, sir.  Thank you.

        11                THE INTERPRETER:  Thank you so much.

        12                THE COURT:  Good afternoon, sir.  You may come

        13     forward.  I'll have you come all the way up to the witness

        14     box here.  And could you stand before me to take the oath?

        15                        MUSTAFA HASSAN,

        16     called on behalf of the government, was duly sworn, was

        17     examined and testified as follows:

        18                THE WITNESS:  Yes.

        19                THE COURT:  Thank you.  You may have a seat in the

        20     witness chair.  Come on up.  Yep.  And, sir, are you

        21     comfortable removing your mask while you testify?

        22                THE WITNESS:  Yeah.

        23                THE COURT:  Could you please state and spell both

        24     your first and last name for the record?

        25                THE WITNESS:  First name is Mustafa.

1    M-U-S-T-A-F-A.  Last name Hassan.  H-A-S-S-A-N.

2            THE COURT:  Thank you.  Could you maybe move that

3    microphone just a little closer to you.  It moves and then

4    it comes up as well.

5            Ms. Svendsen, you may inquire.

6            MS. SVENDSEN:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MS. SVENDSEN:

9    Q.  Good afternoon, sir.

10   A.  Good afternoon.

11   Q.  And how old are you?

12   A.  I'm 34 years old.

13   Q.  And what do you do for a living?

14   A.  I'm a med tech.

15   Q.  You're a med tech?

16   A.  Yeah.  A lab scientist.

17   Q.  And where do you live currently?

18   A.  Currently I'm living and working in Florida.

19   Q.  Okay.  And so how long have you lived there?

20   A.  I started my current assignment on April 11th.

21   Q.  Of this year 2022?

22   A.  This year 2022, yeah.

23   Q.  Okay.  Where did you live before that?

24   A.  I lived in Seattle for six months.  Seattle, Washington.

25   Q.  And so it sounds like you've been moving around a little

1    bit.  What are the circumstances of that?

2    A.  It's interesting.  You know, you leave your family,

3    friends; you go to a new place; and, you know, you just kind

4    of got to get used to things.  And, you know, it's a new

5    place, so it's a challenge, but it's also interesting, so.

6    Q.  And so have you been doing some traveling medical work?

7    A.  Yeah.  It's a -- I'm a medical traveler, basically,

8    yeah.

9    Q.  Okay.

10   A.  It's health care traveling, basically.

11   Q.  And can you tell us a little bit about your educational

12   background?

13   A.  So, I mean, I went to high school here.  When I came

14   here, I started high school here in Ubah Medical Academy.  I

15   went to St. Paul College for about two and a half years.

16   Then I went to the University of Minnesota, which is where I

17   got my bachelor's of science.

18   Q.  And what do you have your bachelor's degree in?

19   A.  Medical laboratory science.

20   Q.  Medical laboratory science?

21   A.  Yep.

22   Q.  So fair to say before you started traveling around for

23   your medical work you lived here in the Twin Cities?

24   A.  I lived and worked here, yeah.

25   Q.  Okay.

1    A.  Minneapolis and St. Paul.

2    Q.  I'm going to ask you some questions about the primary

3    election that took place in August of 2020.

4    A.  Okay.

5    Q.  So, first of all, where were you living in the summer of

6    2020?

7    A.  I was living in Eagan, Minnesota.

8    Q.  And can you remember your actual address there?

9    A.  Yes.

10   Q.  Tell us what it was.

11   A.  It was 2166 Cedar Lane, Unit A, Eagan, Minnesota 55122.

12   Q.  Okay.  Did you serve as a volunteer for any political

13   campaigns during the summer of 2020?

14   A.  Yes.  I volunteered for the Omar Fateh senate campaign

15   for one day.

16   Q.  Why did you serve as a volunteer for that campaign?

17   A.  I just wanted to -- it was a historic moment for the

18   Somali community, so I just wanted to contribute.  I didn't

19   have much time.  I had two jobs, basically.  So I didn't get

20   to do a lot of days, but I was able to volunteer one day.

21   Q.  And what day was that one day?

22   A.  It was the last day.

23   Q.  So the actual day of the primary election?

24   A.  Yeah, yeah.

25   Q.  And were you recruited by anyone, or how did you come to

1   be a volunteer?

2   A.  I got calls from my friend Muse asking me to help out in

3   the campaign a few times.  So I didn't have time initially,

4   but on that day I decided to go out and volunteer.

5   Q.  And so when you say that you got calls from your friend

6   Muse, what is Muse's last name?

7   A.  Mohamed.

8   Q.  Okay.  How do you know Muse Mohamed?

9   A.  We went to high school together, basically, and we

10  studied together sometimes through college as well.

11  Q.  Okay.  So I can't quite do the math on how old you are

12  versus that, but about how long would you say that you've

13  known Mr. Mohamed?

14  A.  Say probably since 2008.

15  Q.  And how well did you stay in touch since high school?

16  A.  Here and there.  We had like a casual relationship, just

17  a normal friendship, nothing extra.  You know, he'd call me

18  sometimes.  I'd call him sometimes.  I'd see him like at the

19  mosque, the Somali mosque and stuff like that.

20  Q.  And when you testified that you studied together in

21  college, what are you referring to?

22  A.  So sometimes we'd go to, like, the library, like, let's

23  say, Augsburg library and study there.  There was a time

24  when I was taking a microbiotics class in MCTC, and he was

25  also taking classes there.  I can't quite remember if he was

1   in that class, but we also studied together during that

2   time.

3   Q.  What was Mr. Mohamed studying?

4   A.  I can't -- I don't really remember.  I don't know what

5   his profession was, to be honest.  I don't know.

6   Q.  He was studying, though, also at MCTC at that time?

7   A.  Yeah.

8   Q.  Okay.  And so he's taking classes there?

9   A.  Classes, yeah.  Yeah.

10  Q.  Okay.  So you testified that you volunteered on the day

11  of the primary election.  What did you expect that you would

12  be doing that day?

13  A.  So I honestly thought I was going to be knocking on

14  doors and giving people rides to the polls, so they can, you

15  know, people that don't have rides, so they can go and vote.

16  Q.  What did you end up doing?

17  A.  I ended up, when I got there, I basically ended up

18  taking letters or envelopes from the campaign office to the

19  election office.

20  Q.  And what was your understanding of what those envelopes

21  were?

22  A.  I had no clue what that was.

23  Q.  Okay.  Where did you go on the day that you volunteered?

24  A.  I went to the campaign office in Lake Street and

25  Oakland, in that area.

1   Q.  When you arrived there at the campaign office, did you

2   see anyone that you knew?

3   A.  Muse was there.  There were a lot of other people there

4   as well that I didn't know.

5   Q.  And what was your interaction with Muse Mohamed, if any,

6   on that day that you volunteered?

7   A.  I can't honestly remember what he and I talked about.

8   We, you know, we were there at the same time.  We didn't

9   really have like a normal conversation about anything.

10  Q.  And so when you arrived, what were you asked to do?

11  A.  When I got there, I waited in the front area, you know,

12  just waiting for instructions, basically.  And then a while

13  later I was taken to a back room where I was, basically,

14  that's where I was given the envelopes to take to the

15  election office.

16  Q.  To take to where?  I'm sorry.

17  A.  The election office.

18  Q.  Okay.  And so you took three envelopes to the election

19  office?

20  A.  Yes.

21  Q.  Okay.  What did -- so you kind of testified about this,

22  but what did you do after you were handed the three

23  envelopes?

24  A.  I basically went from the campaign office, I drove my

25  car to the election office.  When I got there, they took my

1    ID and, you know, and I handed them off.  No one asked any

2    questions.  I didn't think I was doing anything illegal,

3    obviously.  So I gave them my ID.  They took the envelopes,

4    and I was good to go.

5    Q.  Okay.  And I'm going to show you up on the screen a

6    document that's already in evidence as Government's

7    Exhibit 22.  Do you recognize that building that's pictured

8    on the screen?

9    A.  Yes.

10   Q.  What is that?

11   A.  That's the election office I went to.

12   Q.  Okay.  Before you volunteered with the campaign, were

13   you familiar at all with a process called the agent delivery

14   of absentee ballots process?

15   A.  No, I did not.  I basically became a U.S. citizen in

16   December 2020.  So I haven't even voted ever in an election,

17   so I had no idea.  I Googled it afterwards, after I had an

18   interaction with the FBI.

19   Q.  So after you were contacted by law enforcement, you

20   Googled the agent delivery?

21   A.  That's when I Googled it, yes.

22   Q.  And was that the first time that you learned what the

23   agent delivery process --

24   A.  First time ever, yeah.

25   Q.  Okay.  So as to those three envelopes that you were

1    handed at the election office, did you know the three voters

2    whose names were on those envelopes?

3    A.   No.

4    Q.   Did you ever meet those three voters whose names were on

5    the envelopes?

6    A.   No.

7    Q.   Did you ever go to their houses or apartments?

8    A.   No.

9    Q.   Okay.  I'm going to show you an envelope from a

10   different ballot, and that's going to pop up on your screen

11   as Government's Exhibit 9.

12          And so I'm showing you a document that's titled

13   signature -- oops.  I'm on highlight.  Let me see.  I'm

14   showing you a document that's titled Signature Envelope up

15   at the top.  Do you see that?

16   A.   Yes.

17   Q.   All right.  And so just to make sure we're talking about

18   the same document here, up at the top what does it list as

19   the name of the voter?

20   A.   Nasro Mohamed Jama.

21   Q.   Do you know Nasro Jama?

22   A.   No.

23   Q.   And then there's a box that's kind of two-thirds of the

24   way down to the bottom of what I've blown up that says Agent

25   name.  Who is listed as the agent on this ballot?

1    A.  Muse.

2    Q.  And so that's not one of the three ballots that you

3    turned in; is that correct?

4    A.  No.

5    Q.  Okay.  Let's go to the next box down below.  Do you see

6    there's a box that starts out "Witness must complete this

7    section"?

8    A.  Yes.

9    Q.  Who does it indicate was a witness to this ballot?

10   A.  Mustafa Hassan.

11   Q.  Is that you?

12   A.  Yes.

13   Q.  And there's a bunch of stuff that it looks like the

14   witness is certifying here midway down.  "I certify that:

15   The voter showed me the blank ballots before voting; the

16   voter marked the ballots in private or, if physically unable

17   to mark the ballots, the ballots were marked as directed by

18   the voter; the voter enclosed and sealed the ballots in the

19   ballot envelope; and I am or have been registered to vote in

20   Minnesota or am a notary or am authorized to give oaths."

21   Do you see that?

22   A.  Yes.

23   Q.  And then down at the bottom there's a witness signature.

24   Is this a document that you signed?

25   A.  No.

1   Q.  And where it says "Minnesota street address," is that

2   what your address was at the time?

3   A.  That looks like my address, but it's not my address.

4   Q.  What's different about it?

5   A.  So it says 2166th.  It's the T-H.  It's not -- it

6   shouldn't be there.  Cedar Lane.  It says Cedar Line here,

7   but it's Cedar Lane.  So it kind of looks like it, but it's

8   not quite it.

9   Q.  And so the beginning part should just be 2166?

10  A.  Yeah.

11  Q.  And then where it says Cedar Line Avenue, your real

12  address was Cedar lane?

13  A.  Should be, yeah, Cedar Lane.

14  Q.  And did you also have a unit number?

15  A.  Unit A.

16  Q.  Okay.  So that's not listed here?

17  A.  Not listed on there, yeah.

18  Q.  Did you fill out these boxes as a witness to Nasro

19  Jama's ballot?

20  A.  No, I did not.

21  Q.  Did you go to Nasro Jama's house with Muse Mohamed?

22  A.  I did not.

23  Q.  Okay.  So I'm turning your attention forward in time

24  about a year now to the fall of 2021.  Do you understand?

25  A.  Yeah.

1    Q.  Did you have any communications with Muse Mohamed about

2    the government's investigation?

3    A.  I got a call from Muse basically letting me know that he

4    was contacted by the FBI and that he gave my name and my

5    phone number and that I should expect a call.

6    Q.  Going forward in time, were you contacted by anyone else

7    on Mr. Mohamed's behalf?

8    A.  I was contacted by, like, family members that I knew

9    prior, but I chose not to answer those phone calls.

10   Q.  Family members of whom?

11   A.  Muse Mohamed.

12   Q.  Okay.

13          MS. SVENDSEN:  Nothing further, Your Honor.  Thank

14   you.

15          THE COURT:  Mr. Clippert.

16          MR. CLIPPERT:  Can I trouble you to --

17          MS. MUNOZ:  Sorry.

18          MR. CLIPPERT:  No problem.

19                     CROSS-EXAMINATION

20   BY MR. CLIPPERT:

21   Q.  Just a couple questions for you, Mr. Hassan.

22   A.  Yeah.

23   Q.  I'm not clear about something.  I thought when you

24   initially got on the stand and said you were given

25   envelopes, you didn't really look at them; is that right?

1    A.  The envelopes I was given?

2    Q.  Yes.

3    A.  Well, when I got there, I was told to fill out a paper,

4    to write stuff on it.  I didn't really pay attention to it

5    because obviously I had no reason to think I was doing

6    anything wrong.  So that's what I did.  And then the

7    envelopes were put together by other people, and then they

8    were handed to me and told me to deliver.

9    Q.  Did you see the people put together those envelopes

10   right there?

11   A.  Yeah.  I don't remember their names.  Yeah.

12   Q.  And you said then you turned in these envelopes and that

13   was your last --

14   A.  Yeah, I turned the envelopes, yeah, to the election

15   office, like I said, and that was the end of the day, yeah.

16   Q.  So you didn't deliver envelopes to anybody else or

17   ballots to anybody else?

18   A.  No.

19   Q.  That was your last contact?

20   A.  Yeah, that was pretty much it, yeah.

21          MR. CLIPPERT:  Nothing further, Your Honor.

22          THE COURT:  Thank you.

23          Ms. Svendsen.

24

25

1        REDIRECT EXAMINATION

2   BY MS. SVENDSEN:

3   Q.  Just to clarify briefly.  You saw people put together

4   envelopes where?

5   A.  In the election campaign, the campaign office.

6   Q.  At the campaign office?

7   A.  Yeah.

8   Q.  Okay.  Thank you.

9   A.  That back room that I was talking about.

10            THE COURT:  You may step down, sir.  Thank you.

11  You are excused.

12            THE WITNESS:  Thank you.

13            THE COURT:  And the government may call its next

14  witness.

15            MS. SVENDSEN:  Thank you, Your Honor.  The

16  government calls Abdiriman Ahmed Muse.

17            THE COURT:  Good afternoon, sir.  You may come

18  forward all the way up to me.  And I'll have you stand to

19  take the oath.  Could you raise your right hand?

20                     ABDIRIMAN MUSE,

21  called on behalf of the government was duly sworn, was

22  examined and testified as follows:

23            THE WITNESS:  Yep.

24            THE COURT:  Thank you.  You may have a seat in the

25  witness chair, please.  And that microphone comes up to

1    reach your height.  There you go.  Could you please state

2    and spell both your first and last name for the record?

3              THE WITNESS:  A-B-D-I-R-I-M-A-N.  Last name is

4    M-U-S-E.

5              THE COURT:  You may inquire.

6              MS. SVENDSEN:  Thank you, Your Honor.

7                         DIRECT EXAMINATION

8    BY MS. SVENDSEN:

9    Q.  Good afternoon, sir.

10   A.  Good afternoon.

11   Q.  How old are you?

12   A.  22.

13   Q.  And where do you live?

14   A.  3018 Pillsbury Avenue South, Apartment 203, Minneapolis,

15   Minnesota 55408.

16   Q.  Okay.  About how long have you lived there?

17   A.  Three and a half years.

18   Q.  And can you tell us a little bit about your educational

19   background?

20   A.  I have a bachelor's.

21   Q.  What is that in?

22   A.  In MIS, management information systems.

23   Q.  Management information systems?  Is that a computer

24   area?

25   A.  IT.

1    Q.  Okay.  And following your bachelor's degree, have you

2    pursued further education?

3    A.  Yeah.  I'm currently in a master's for cyber operations.

4    Q.  And what do you do for a living?

5    A.  I'm an engineer at Target.

6    Q.  And so you work at Target corporate, basically?

7    A.  Yep.

8    Q.  Okay.  I'm going to ask you some questions about the

9    primary election that took place in August of 2020.  First

10   of all, do you recall whether you voted in the August 2020

11   primary election?

12   A.  No, I did not vote.

13   Q.  You did not?

14   A.  Nope.

15   Q.  All right.  I'm going to show you a document that's

16   previously been admitted into evidence, and it is marked

17   Government's Exhibit 6.  And up at the top this document is

18   titled Absentee Ballot Agent Return Log.  Do you see that?

19   A.  Yep.

20   Q.  And what I want to show you is down closer to the bottom

21   of the page where there is a box here, and it indicates that

22   it's some information related to an absentee voter by the

23   name of -- can you read what that says?

24   A.  Abdirahman Muse, which is spelled wrong.  I think it's

25   trying to spell my name wrong on it.

1    Q.  And so does that look similar to your name?

2    A.  Similar, yeah.

3    Q.  Is that your name?

4    A.  No.

5    Q.  What's the difference between that name that's listed on

6    the paper and your name?

7    A.  There's no A-H.  There's an I instead of A-H.

8    Q.  Okay.  And so you spelled your name just a minute ago,

9    sir, for us.  And I believe you said that it's supposed to

10   be A-B-D-I-R-I-M-A-N?

11   A.  I-R-I-M-A-N.

12   Q.  Okay.  There's an I on either side of the R, correct?

13   A.  Yes.

14   Q.  Okay.  And then down below that it lists Absent Voter

15   Address.  Do you see that?

16   A.  Yeah.

17   Q.  Is that your address?

18   A.  No.  It's incorrect.  It's apartment -- instead of 302,

19   it's 203.

20   Q.  Okay.  And then can you take a look at the street name?

21   A.  Yeah.  Is that a double S?  Supposed to be L-L-S, bury.

22   Q.  Okay.  And so that's similar to your street name and

23   similar to your apartment number, but not accurate; is that

24   correct?

25   A.  Yes.

1    Q.  Okay.  In the box that's marked Agent Name, can you see

2    what it says?

3    A.  Yep.

4    Q.  What does it say?

5    A.  Muse Mohamed.

6    Q.  Do you know anyone named Muse Mohamed?

7    A.  No.

8    Q.  Did you ask Muse Mohamed to act as your agent to pick up

9    and drop off a ballot for you in August of 2020?

10   A.  No.

11   Q.  Did you ask anyone to do that?

12   A.  No.

13   Q.  All right.  Let's move on to a document that is already

14   in evidence as Government's Exhibit 10.  And up at the top

15   you will see that it's titled request -- oh, I cut that off

16   in a really unfortunate way.  It's called Request for Agent

17   Delivery of Absentee Ballot.  Can you see that, sir?

18   A.  Yep.

19   Q.  And up at the top, right under where it says Request and

20   Certification, there's a box with a name filled into it.  Is

21   that your name?

22   A.  If it is, it's misspelled incorrectly.

23   Q.  Okay.  And how is it misspelled?

24   A.  Instead of -- there's an A instead of an I.

25   Q.  So this time it's A-B-D-I-R-A-M-A-N Muse; is that

1    correct?

2    A.  Yeah.  That's what I see, yeah.

3    Q.  Okay.  And so that is misspelled.  But if we go back to

4    Government's Exhibit 6, is it misspelled differently than it

5    was misspelled on this previous document?

6    A.  Yes, by the way it looks.

7    Q.  Okay.  And so then turning back to Government's

8    Exhibit 10 and moving down the page just a little bit, it

9    indicates "I, Abdiriman Muse, certify that I would have

10   difficulty getting to the polls because of incapacitating

11   health reasons or have a disability."

12            In August of 2020 did you have incapacitating

13   health reasons or a disability?

14   A.  No.  I've been healthy my whole life.

15   Q.  Okay.  And down at the bottom is that your signature

16   where it says Signature?

17   A.  No.

18   Q.  Was this a form that you had ever seen before this

19   investigation started?

20   A.  No.

21   Q.  Okay.  Then I want to take a look at another document

22   that's already in evidence as Government's Exhibit 11.  And

23   up at the top it's titled 2020 Minnesota Absentee Ballot,

24   and then it's Application underneath that sticker.  Do you

25   see that?

1    A.  Which one?

2    Q.  It says 2020 Minnesota Absentee Ballot A.  Do you see

3    that on your screen?

4    A.  I see that, yeah.

5    Q.  Okay.  And in Box 2 it indicates that it's an

6    application for who?

7    A.  Well, it's -- I think it's probably for me, but it's

8    misspelled by name again.

9    Q.  And how is it misspelled this time?

10   A.  It's misspelled with an A instead of an I.

11   Q.  Okay.  And so it should be A-B-D-I-R-I-M-A-N; is that

12   correct?

13   A.  Yes, that's correct.

14   Q.  Okay.  And just to kind of cut to the chase on this

15   document, down at the bottom there's a certification and a

16   signature.  Is that your signature?

17   A.  No, it's not my signature.

18   Q.  Did you give anyone permission to fill it out and sign

19   it on your behalf?

20   A.  No.

21   Q.  Had you ever seen this document prior to the start of

22   this investigation?

23   A.  No.

24   Q.  All right.  Let's go back up to the top of it to some of

25   these identifiers here.  In Box 3 there's a date of birth

1    listed.  Is that your correct date of birth?

2    A.  If it's 7/10/99, 1999, then it is, but kind of hard to

3    read the last year.

4    Q.  And then what about the phone number that's listed in

5    the phone number box?  Is that your phone number?

6    A.  That's my mother's home phone number, not my personal.

7    Q.  Do you live with your mother?

8    A.  No.

9    Q.  Do you have your own phone number that's different than

10   that?

11   A.  Yep.

12   Q.  Do you think that's a phone number that you've ever been

13   associated with for any reason?

14   A.  It's been eight-plus years before, when I was an

15   adolescent.

16   Q.  Okay.  But you did live at that house like several years

17   ago?

18   A.  Yeah.

19   Q.  Okay.  And then if we turn to Box 5 here that starts out

20   "address where you live," can you take a look at that

21   information and tell us whether that was accurate for you in

22   August of 2020?

23   A.  No.  I think that apartment, instead of 302, it should

24   be 203.  I think Pillsbury is spelled with a B in it.

25   Q.  Okay.  So the apartment number is incorrect?

1    A.  Yep.

2    Q.  And the name of the street is close, but not correct?

3    A.  Yeah.

4    Q.  Okay.  And then finally on that one there's this Box 4

5    that calls for a social security number.  Do you see that

6    box?

7    A.  Yep.

8    Q.  And I take it that you know the last four digits of your

9    social security number; is that right?

10   A.  Yep.

11   Q.  Okay.  It looks like what has occurred inside of the

12   box -- can you tell?

13   A.  Something got scribbled out, I think.

14   Q.  Okay.  So somebody wrote something that's scribbled out.

15   And then these four numbers to the right, are those your

16   actual last four?

17   A.  Yeah, them are my last four, yeah.

18   Q.  Okay.  And then just to be clear, you testified you did

19   not sign this form; is that correct?

20   A.  No, I did not sign that.

21   Q.  And so did you give anyone permission to sign it on your

22   behalf?

23   A.  No.

24   Q.  Did you ask anyone to obtain a ballot for you in August

25   of 2020 on your behalf?

1    A.  No.

2              MS. SVENDSEN:  Nothing further, Your Honor.  Thank

3    you.

4              THE COURT:  Mr. Clippert.

5                        CROSS-EXAMINATION

6    BY MR. CLIPPERT:

7    Q.  So just a couple quick follow-ups.  Sir, so the first

8    time you saw these documents was when an FBI agent presented

9    them to you?

10   A.  Yes.

11   Q.  So you hadn't seen them prepared or you have no idea who

12   did that, right?

13   A.  No.

14   Q.  Right.  And so we just reviewed that the documents got

15   your name spelled wrong, right?

16   A.  Mm-hmm.

17   Q.  The address is wrong?

18   A.  Yeah.

19   Q.  The apartment number is wrong?

20   A.  Mm-hmm.

21   Q.  Just make sure you say "yes" or "no" for the court

22   reporter.

23   A.  Yes.  Yes, yes.

24   Q.  Thank you.  The apartment number is wrong, and the phone

25   number is wrong; is that right?

1    A.  Yes.

2    Q.  So not a good job; fair to say?

3    A.  Yeah.

4                MR. CLIPPERT:  Okay.  Nothing further.

5                MS. SVENDSEN:  Nothing further, Your Honor.  Thank

6    you.

7                THE COURT:  You may step down, sir, and you are

8    excused.  Thank you.

9                THE WITNESS:  Thank you.

10               THE COURT:  Do you have your mask?  Do you have

11   it?

12               THE WITNESS:  I didn't have a mask.

13               THE COURT:  Oh, you didn't have it.  That's right.

14   Okay.  Sorry.

15               The government may call its next witness.

16               MS. MUNOZ:  Your Honor, the government calls Osman

17   Abdulle.  Your Honor, I understand he's on his way up now.

18               THE COURT:  All right.  Thank you.  Similar timing

19   as for the last few?

20               MS. MUNOZ:  Yes.

21               THE COURT:  Okay.  Good afternoon, sir.  I will

22   have you come up to the witness stand to take the oath.

23   Would you raise your right hand for me?

24

25

1                    OSMAN ABDULLE,

2     called on behalf of the government, was duly sworn, was

3     examined and testified as follows:

4                    THE WITNESS:  I do.

5                    THE COURT:  Thank you.  You may have a seat in the

6     witness chair.  And please state and spell both your first

7     and last name for the record.

8                    THE WITNESS:  Yes.  Good afternoon, Your Honor.

9     For the record first name is Osman, O-S-M-A-N.  Last name is

10    Abdulle, A-B-D-U-L-L-E.

11                   THE COURT:  You may inquire.

12                   MS. MUNOZ:  Thank you, Your Honor.

13                   DIRECT EXAMINATION

14    BY MS. MUNOZ:

15    Q.  Mr. Abdulle, can you please tell the jury what you do

16    for a living?

17    A.  Yes.  I am a Somali interpreter.  I interpret English to

18    Somali and Somali to English.

19    Q.  In what settings do you provide interpretation services?

20    A.  Mostly with the courts, but sometimes other settings,

21    like social settings or state agencies, like workers

22    compensation offices or unemployment insurance offices, as

23    well as social security offices.

24    Q.  Do you work in both state and federal courts?

25    A.  I do.

1    Q.  What are the duties and responsibilities of a court

2    interpreter?

3    A.  For a court interpreter, the task for a court

4    interpreter is to interpret what's being said without adding

5    or omitting anything to it.

6    Q.  How long have you served as a court interpreter?

7    A.  About 20 years now, since 2003.

8    Q.  What languages do you speak, sir?

9    A.  Somali and English.

10   Q.  How long have you spoken the Somali language?

11   A.  All of my life.

12   Q.  How about the English language?  How long have you

13   spoken that?

14   A.  I began to learn English first when I was about fourth,

15   fifth grade.  A long time ago.

16   Q.  What is your educational background?

17   A.  I have finished high school in Somalia.  I came to

18   Canada when I was still relatively young.  So I took some

19   high school remedial courses to obtain my high school

20   diploma, and then after that I took four years college.

21   Q.  Have you received any specialized training as an

22   interpreter?

23   A.  I've taken a number of small trainings.  The first one

24   was when I was qualifying for the state court interpreting

25   program.  I took some trainings, but those trainings lasted

1    for about a day or two.  And then after that I took another

2    training that the University of Minnesota offered through

3    the state.  The state sponsored that course, and then I took

4    that, and that lasted a lot longer, lasted about several

5    months.  I'm not sure exactly.  It was a long time ago.

6    Q.  Have you ever worked as an interpreter for the grand

7    jury in the District of Minnesota?

8    A.  I have.

9    Q.  Did you serve as an interpreter for the federal grand

10   jury in the fall of 2021?

11   A.  I have.

12   Q.  Did you serve on multiple days?

13   A.  I did.

14   Q.  I'm going to show you what's been admitted as Government

15   Exhibit Number 4, and I will represent to you that this is a

16   transcript from the grand jury proceedings on September 30th

17   of 2021.  I'm going to turn to page 2 of that exhibit.

18          I'm going to highlight here where it says,

19   "Whereupon, Osman Abdulle, having been duly sworn by the

20   foreperson of the grand jury, interpreted and translated as

21   follows:"  Is that you, sir?

22   A.  Yes.

23   Q.  And so you served as an interpreter on September 30th of

24   2021; is that correct?

25   A.  Correct.

1    Q.  The transcript goes on to say, "Muse Mohamed, called as

2    a witness herein, having been first duly sworn by the

3    foreperson of the grand jury, was examined and testified as

4    follows:"  Is that correct?

5    A.  Yes.

6    Q.  Did you serve as an interpreter for Muse Mohamed during

7    his grand jury testimony on September 30th?

8    A.  I do believe so, yes.

9    Q.  Now, I'm going to show you what's been marked as

10   Government Exhibit Number 1 and already in evidence.  This

11   is a transcript from the grand jury proceedings on

12   October 14th of 2021.  And I'm going to turn your attention

13   to page 2 of this exhibit.

14          And at the top it says, "Whereupon, Osman Abdulle

15   was sworn as the Somali interpreter."  Do you see that

16   section?

17   A.  I do.

18   Q.  Is this you, Mr. Abdulle, whose name is referenced?

19   A.  Yes.

20   Q.  And so were you the interpreter for Mr. Mohamed on

21   October 14th of 2021 in grand jury?

22   A.  I believe so.

23   Q.  When you went in front of the grand jury as an

24   interpreter on September 30th of 2021, did you take an oath?

25   A.  I did.

1    Q.  And did this happen before you began interpreting

2    anything for Mr. Mohamed?

3    A.  Yes.

4    Q.  When you were serving as an interpreter on October 14th,

5    2021, did you also take an oath?

6    A.  I did.

7    Q.  And did that oath happen before you began interpreting

8    for Mr. Mohamed?

9    A.  Yes.

10   Q.  Was the oath that you took on September 30th and

11   October 14th the same?

12   A.  I believe so.

13   Q.  And can you explain to the members of the jury, what did

14   that oath require of you?

15   A.  When I'm under oath, I'm required to interpret what's

16   being said faithfully.  That's -- and this time is usually

17   to the best of my knowledge.  So to me my task was to

18   interpret what's being said accurately and faithfully to the

19   best of my knowledge.

20   Q.  And did you do that on September 30th of 2021?

21   A.  I did.

22   Q.  And what about on October 14th of 2021?

23   A.  I did as well.

24   Q.  Do you recall what language was used to ask the

25   questions?

1    A.  Yes.

2    Q.  What was the language?

3    A.  Somali.

4    Q.  I'll ask that one more time.  When questions were being

5    asked in grand jury, what language was used for the

6    questions?

7    A.  Oh, I'm sorry.  I misspoke.  English.

8    Q.  And what did you interpret those questions, from English

9    into what language?

10   A.  To Somali.

11   Q.  And what language was used to answer the questions?

12   A.  Somali.

13   Q.  And what did you interpret the Somali answers into,

14   which language?

15   A.  English.

16   Q.  In the course of your nearly 20 years, I believe you

17   testified to nearly 20 years as an interpreter, have you

18   been in a situation where the person that you were

19   interpreting for did not understand your interpretation?

20   A.  Yes.

21   Q.  Did that person do something to convey their

22   misunderstanding?

23   A.  Yes.  Typically, they would say "I don't understand" or

24   they would look at you, or you can just tell that they have

25   not understand what was being interpreted.  So, yes, usually

1    they would be or ask, you know, "I don't understand" or "I

2    don't get it" or something.

3    Q.  If a witness says that he does not understand the

4    interpretation, who provides the clarification?

5    A.  The person who has posed the question.

6    Q.  Do you as the interpreter provide the clarification?

7    A.  No.

8    Q.  To the best of your knowledge, did your translation

9    accurately reflect what was said during Mr. Mohamed's

10   September 30th grand jury testimony?

11   A.  Yes.

12   Q.  And to the best of your knowledge, did your translation

13   accurately reflect what was said during Mr. Mohamed's

14   October 14th grand jury testimony?

15   A.  Yes.

16              MS. MUNOZ:  Your Honor, I have no further

17   questions for Mr. Abdulle.

18              THE COURT:  Thank you.

19              Mr. Clippert.

20                    CROSS-EXAMINATION

21   BY MR. CLIPPERT:

22   Q.  Just a few follow-ups, if I could, please.

23   A.  Sure.

24   Q.  The Country of Somalia is obviously -- it's not

25   homogenous, right, in terms of its language?  Is that fair

1   to say?  There's different dialects for different parts of

2   the country?

3   A.  Sure.

4   Q.  Like the southern part of Somalia, the dialect is

5   influenced by Kenya, right?  The language is from Kenya or

6   not?

7   A.  Not to my knowledge, no.

8   Q.  Okay.  All right.  But let's go back.  So there's

9   different dialects, and so the dialects for the northern

10  part of Somalia might be different than the southern part of

11  Somalia?

12  A.  Yes.

13  Q.  Okay.  And you were interviewed recently by the FBI and

14  some of the folks right to my left; is that right?

15  A.  Right.

16  Q.  And you explained that Minnesota doesn't have a

17  certification process for translators for the court system;

18  is that right?

19  A.  Federal, yes.

20  Q.  Okay.  You described a situation where the -- where you

21  would be interpreting and the witness or whoever you were

22  interpreting for would look confused.  Have you had

23  situations where you've interpreted something wrong and the

24  witness or the person knew it?

25  A.  Not deliberately, no.

1    Q.  Okay.  Not deliberately?

2    A.  No.

3              MR. CLIPPERT:  I have nothing further.

4              THE COURT:  Ms. Munoz, anything?

5              MS. MUNOZ:  No, Your Honor.  Thank you.

6              THE COURT:  You may step down, sir.

7              THE WITNESS:  Thank you.

8              THE COURT:  Thank you.

9              Members of the jury, we're going to break here for

10   today, and I'll ask you to come back at 9 o'clock in the

11   morning and let you no know that tomorrow we will go till

12   4 o'clock, and we will break at four tomorrow afternoon.

13             Have a good evening, everyone.

14             All rise for the jury.

15   4:52 P.M.

16                        **IN OPEN COURT**

17                     **(JURY NOT PRESENT)**

18             THE COURT:  You may all be seated.

19             We are on the record out of the presence of the

20   jury.

21             Is there anything that the government wishes to

22   call to the court's attention before we break?  Ms. Munoz?

23   Ms. Svendsen?

24             MS. SVENDSEN:  No, Your Honor, but I apologize for

25   stepping out.  I had COVID a few weeks ago; and while I'm no

1   longer contagious or anything like that, once in a while I

2   have a horrible cough attack.

3           THE COURT:  No, I'm glad that you took care of it

4   and that you are well now.  Thank you.

5           Anything else, Ms. Munoz?

6           MS. MUNOZ:  No, Your Honor.

7           THE COURT:  Mr. Clippert, for the defense,

8   anything?

9           MR. CLIPPERT:  Nothing for the record, Your Honor,

10  no.

11          THE COURT:  Okay.  If you all could just hang

12  around for a few minutes, I've got the final jury

13  instructions drafted.  And so I'll give you a few copies of

14  those, and then we can have a charge conference whenever

15  it's appropriate; but since we have them and since you were

16  mostly in agreement, I'll just -- my law clerk is printing

17  those now, and so I'll get them to you before you leave.

18  Okay?

19          All right.  Thanks, everyone.  I will see you

20  tomorrow morning.

21          COURTROOM DEPUTY:  All rise.  Court's in recess.

22          (Court adjourned at 4:54 p.m., 05-09-2022.)

23          I, Renee A. Rogge, certify that the foregoing is a
    correct transcript from the record of proceedings in the
24  above-entitled matter.
                    Certified by:  /s/Renee A. Rogge
25                                 Renee A. Rogge, RMR-CRR